1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT FOR THE**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11  DEANNA RANGEL,                         )       1:09-cv-01467-AWI-BAM
                                           )
12              Plaintiff,                 )       ORDER RE: MOTION FOR
                                           )       SUMMARY JUDGMENT OR
13         v.                              )       PARTIAL SUMMARY
                                           )       JUDGMENT IN THE
14  AMERICAN MEDICAL RESPONSE              )       ALTERNATIVE
    WEST; JOSE MARTINEZ; and               )
15  TRACY J. FISHER,                       )       (Doc. 57)
                                           )
16              Defendants.                )
    _____)

17
18
19

**I. INTRODUCTION**

20
21  Defendants American Medical Response West (hereinafter referred to as "AMR") and Tracy J.

22  Fischer (hereinafter referred to as "Fischer") have filed a motion for summary judgment or partial

23  summary judgment in the alternative pursuant to Federal Rule of Civil Procedure 56.  For reasons

24  discussed below, the motion for summary judgment shall be denied.  The motion for partial summary

25  judgment (i.e., summary adjudication) shall be granted in part and denied in part.  Summary

26  adjudication shall be granted in favor of Fischer (but not AMR) as to the third cause of action for

27  defamation and in favor of AMR as to the fifth cause of action for sexual battery; summary

28  adjudication of all other causes of action and the punitive damages claim shall be denied.

## II. FACTS AND PROCEDURAL BACKGROUND

The Court refers the parties to previous orders for a complete chronology of the proceedings.  On January 21, 2010, plaintiff Deanna Rangel (hereinafter referred to as "Plaintiff" or "Rangel") filed her first amended complaint against defendants AMR, Fischer (sued as Tracy J. Fisher) and Jose Martinez, asserting causes of action for (1) violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq. (against AMR), (2) violation of the California Fair Employment and Housing Act (FEHA), California Government Code § 12900 et seq. (against AMR and Martinez), (3) defamation – slander per se (against AMR and Fischer), (4) wrongful discharge in violation of public policy (against AMR) and (5) sexual battery in violation of California Civil Code § 1708.5 (against AMR and Martinez).  In the first amended complaint, Rangel alleged as follows:

> "Plaintiff is a female who was sexually harassed, defamed and retaliated against by Defendant employer, American Medical Response West . . . and Defendants Jose Martinez . . . and Tracy J. Fisher [sic] . . . , supervisors for AMR and Plaintiff's supervisors, creating a hostile work environment and quid pro quo harassment, in Tulare County, California, at the time of the acts giving rise to this action."

Rangel further alleged:

> "Defendant, AMR, was an employer at all times relevant herein, and is a California corporation, qualified and doing business in the State of California, and has continuously had and does now have at least fifteen employees.  Defendant, AMR, is an enterprise engaged in commerce within the meaning of 42 U.S.C. § 2000e(b). [¶] At all times relevant herein Defendants, Martinez and Fisher [sic], were employees, agents and supervisors of Defendant, AMR, within the meaning of California Government Code § 12926(r)."

Rangel further alleged:

> "On or about November 6, 2008, Plaintiff filed charges of discrimination and harassment with the U.S. Equal Employment Opportunity Commission (hereinafter referred to as 'EEOC') and California Department of Fair Employment and Housing (hereinafter referred to as 'DFEH') against Defendant, AMR, alleging discrimination, sex harassment, and retaliation . . . . [¶] On or about November 6, 2008, Plaintiff filed a charges [sic] of discrimination with [DFEH] against Defendants, Martinez and Fisher [sic], alleging discrimination, sex harassment, and retaliation . . . . A copy of the DFEH/EEOC charges are attached as Exhibits A and B, hereto."

Rangel's DFEH/EEOC complaints, which had been attached to Rangel's original complaint filed

August 20, 2009, alleged sex discrimination by AMR and Martinez and further alleged as follows:

> "On May 5, 2008, I [Rangel] was subjected to a write-up. On August 10, 2008, I was verbal [sic] and visually sexually harassed by Jose Martinez, Paramedic/Supervisor. On August 28, 2008, I was terminated while in the position of EMI 1 earning $14.45 per hour. I was hired on June 25, 2001. [¶] T. J. Fisher [sic], Administrative Supervisor told me I was being written up due to a patient complaint. T. J. Fisher [sic] told me I was being terminated due to misconduct."

Rangel's DFEH/EEOC complaints further alleged:

> "I believe I was subjected to a write-up and verbally and visually sexually harassed which is discrimination on the basis of my sex (female) and terminated in retaliation for complaining. My beliefs are based on the following: [¶] A. On May 5, 2008, I was subjected to a write-up due to a patient complaint although non female employees have received patient complaints and are not written up. [¶] B. On August 10, 2008, I was verbally and visually sexually harassed (example on file with DFEH) by Jose Martinez Paramedic/Supervisor. The harassment created a hostile work environment. [¶] C. On August 10, 2008, I reported the incident to Brian Perez, Shop Stewart [sic]/Paramedic and nothing was done. [¶] D. On August 28, 2008, I was terminated for misconduct although non female employees are not terminated for misconduct."

On March 4, 2011, AMR and Fischer filed their motion for summary judgment or partial summary judgment (i.e., summary adjudication) in the alternative pursuant to Federal Rule of Civil Procedure 56, contending the absence of genuine issues of material fact entitles them to judgment as a matter of law. On March 28, 2011, Rangel filed her opposition to AMR's and Fischer's motion. AMR and Fischer filed their reply to Rangel's opposition on April 4, 2011. On May 18, 2011, the Court issued an order requiring the parties to brief additional issues. Rangel filed her supplemental brief on May 31, 2011; AMR and Fischer filed their supplemental brief on June 13, 2011.

### III. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see* Fed. R. Civ. P. 56(c)(1)(A).  "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 387 (2010) (citing *Celotex, supra,* at p. 325).  If the moving party meets its initial burden, the burden shifts to the non-moving party to present evidence establishing the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538.  A court ruling on a motion for summary judgment must construe all facts and inferences in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Even if the motion is unopposed, the movant is not absolved of the burden to show there are no genuine issues of material fact, *Henry v. Gill Industries, Inc.,* 983 F.2d 943, 949-50 (9th Cir. 1993), although the court may assume the movant's assertions of fact to be undisputed for the purposes of the motion and grant summary judgment if the facts and other supporting materials show the movant is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2), (3).

## IV. DISCUSSION

The following facts are undisputed for the purposes of defendants' motion.  On August 10, 2008, Rangel, Martinez and Rangel's partner – another AMR employee named Chris Zeigers – were on duty at AMR's Porterville, California, station.  As Rangel and Zeigers were exiting the station, an altercation between Rangel and Martinez ensued, culminating in Rangel's telling Martinez he "didn't have any balls" and Martinez's unzipping his pants and exposing his testicles to Rangel.  Martinez's testicles were visible for about a second.  AMR and Fischer now contend summary judgment must be granted because the foregoing is insufficient to establish triable issues on any of Rangel's claims.

4

1    ***A. First cause of action (violation of Title VII of the Civil Rights Act)*** – As a threshold matter,

2    AMR moves for summary adjudication of Rangel's first cause of action for violation of Title VII of

3    the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq.   Under this cause of action,

4    Rangel alleges: "Since at least May 2008, Defendant, AMR, has engaged in unlawful employment

5    practices in violation of § 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1).   These practices

6    including subjecting Plaintiff to a sexually hostile, abusive, intimidating and offensive work

7    environment, which culminated in an adverse tangible employment action."   Rangel further alleges,

8    "Since at least May 2008, Defendant, AMR, subjected Plaintiff to adverse employment actions in

9    retaliation for her opposition to and rejection of the sexual harassment in violation of § 704(a) of

10   Title VII, 42 U.S.C. § 2000e-3(a).   These practices include but are not limited to unjust discipline,

11   continued harassment, and, ultimately, termination of her employment on or about August 28, 2008."

12          AMR first contends that, to the extent Rangel intends to claim sexual harassment based on

13   a hostile work environment, summary adjudication of this cause of action must be granted because

14   Martinez's act of exposing his testicles to Rangel was an isolated incident hardly severe or pervasive

15   enough to alter the conditions of Rangel's employment.   Title VII provides "[i]t shall be an unlawful

16   employment practice for an employer-- [¶] (1) to . . . discriminate against any individual with respect

17   to his compensation, terms, conditions, or privileges of employment, because of such individual's

18   . . . sex," 42 U.S.C. § 2000e-2(a), and "discrimination on the basis of sex . . . includes sexual

19   harassment in the form of a hostile work environment."   *E.E.O.C. v. Prospect Airport Services, Inc.,*

20   621 F.3d 991, 997 (9th Cir. 2010).   "A plaintiff may establish a sex hostile work environment claim

21   by showing that he was subjected to verbal or physical harassment that was sexual in nature, that the

22   harassment was unwelcome and that the harassment was sufficiently severe or pervasive to alter the

23   conditions of the plaintiff's employment and create an abusive work environment."   *Dawson v. Entek*

24   *Intern.,* 630 F.3d 928, 937-38 (9th Cir. 2011).   Having reviewed the pleadings and all competent and

25   admissible evidence submitted, the Court finds, contrary to AMR's contention, a reasonable trier of

26   fact could find the alleged misconduct was severe enough to have created an abusive environment.

27

28                                                                5

"To determine whether conduct was sufficiently severe or pervasive to [alter the conditions of the plaintiff's employment and create an abusive environment], [courts] look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vasquez v. County of Los Angeles,* 349 F.3d 634 (9th Cir. 2003) (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). "The 'severe or pervasive' element has both objective and subjective components." *Prospect Airport Services, Inc., supra,* 621 F.3d at 999 (citing *Brooks v. City of San Mateo,* 229 F.3d 917, 924 (9th Cir. 2000)). "A plaintiff must establish that the conduct at issue was both objectively and subjectively offensive: he must show that a reasonable person would find the work environment to be 'hostile or abusive,' and that he in fact did perceive it to be so." *Dawson,* 630 F.3d at 938 (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). "There is a subjective requirement as well as an objective requirement, because 'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment.' " *Prospect Airport Services, Inc.,* at p. 999 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

At her deposition Rangel testified the following exchange occurred moments before Martinez exposed his testicles to her. As she was walking to her ambulance, Rangel jokingly told Martinez to not dirty the Porterville station because she had just finished cleaning it. In response, Martinez told Rangel she couldn't come to the station and tell people what to do just because she wore the pants at home. Martinez further told Rangel, "Remember you have a write-up, so you better watch out." According to Rangel, Martinez pulled out a knife, opened it and said something to the effect of "I can cut you right now" or "I can slice you right now." Rangel told Martinez he "didn't have any balls because no one drops out of the [California Highway Patrol] in less than a week." Martinez then said something to Rangel along the lines of "I'll show you I have balls," unzipped his pants, put his hands down his pants, pulled out his testicles and said, "[A]nd look, they're even shaven, too."

1  Objectively, Martinez's acts of threatening to physically assault Rangel coupled with his exposing

2  himself to Rangel are themselves sufficiently serious to constitute severe conduct for the purpose

3  of Title VII.   Rangel also testified she felt "degraded," "assaulted," "paralyzed" and "extremely

4  stressed" as a result, and thus subjectively perceived Martinez's actions to be hostile and abusive.

5       In arguing Martinez's alleged misconduct could not have been severe enough to alter the

6  conditions of Rangel's employment because it was simply an isolated incident, AMR essentially

7  contends isolated incidents can never underlie a sex hostile work environment claim.   AMR has

8  provided no authority – and the Court's research reveals no authority – to support this proposition.

9  Isolated incidents, if extremely serious, may amount to discriminatory changes in the terms and

10  conditions of employment.  *See Faragher, supra,* 524 U.S. at 788; *see also Worth v. Tyler,* 276 F.3d

11  249, 268 (7th Cir. 2001) ("There is no minimum number of incidents required to establish a hostile

12  work environment . . . .   Indeed, we have often recognized that even one act of harassment will

13  suffice if it is egregious"); *Lockard v. Pizza Hut, Inc.,* 162 F.3d 1062, 1072 (10th Cir. 1998) (single

14  instance of physically threatening and humiliating behavior that unreasonably interfered with

15  plaintiff's ability to perform her job duties severe enough to create actionable hostile work

16  environment); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir. 1995) (abrogated on other grounds

17  by *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998))

18  ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's

19  employment and clearly creates an abusive work environment for purposes of Title VII liability").

20       In the Court's view, this is such a case.   The evidence leaves open the possibility the alleged

21  misconduct may have been more than just innocuous behavior toward a coworker.   The evidence

22  shows this may have been a case of lewd and obscene conduct by a male superior toward a female

23  subordinate that could conceivably have constituted the crime of indecent exposure under California

24  law.  *See* Cal. Pen. Code, § 314 ("Every person who willfully and lewdly . . . [¶] [ ] [e]xposes his

25  person, or the private parts thereof, in any public place, or in any place where there are present other

26  persons to be offended or annoyed thereby . . . [¶] . . . is guilty of a misdemeanor").   Furthermore,

27

28                                        7

Rangel does not rely solely upon the exposure incident to support her Title VII claim, as AMR would have the Court believe.  At her deposition, Rangel testified that on one prior occasion, as she was washing dishes in the Porterville station, Martinez walked up to her, grabbed her hair and started playing with her hair while telling her how beautiful it was.  Rangel further testified there were other times when Martinez would "come by . . . and spank [her] in the ass with a towel."  Based on this evidence, a reasonable trier of fact could conclude Martinez exposed himself to Rangel for his own sexual gratification.  Rangel also testified other AMR employees told her Martinez had said Rangel "didn't deserve to be working as an EMT," called her a "bitch," "whore," "cochina," "fuckin' worthless," and that he had said similar things about his wife and other women. Based on this evidence, a reasonable trier of fact could also conclude Martinez's alleged misconduct was driven by anti-female animus.  Accordingly, even though it appears Martinez threatened and exposed himself to Rangel once, that behavior can fairly be characterized as severe and objectively offensive.

AMR further contends summary adjudication of Rangel's Title VII cause of action must be granted in favor of AMR because AMR cannot held liable for Martinez's alleged misconduct in the absence of any complaints by Rangel.  AMR contends it had no actual or constructive knowledge of any prior alleged harassment, either by Martinez or against Rangel, and that Rangel never complained to management, human resources or her union about Martinez before the exposure incident.  The vicarious liability potentially faced by an employer for harassment committed by an employee depends on the employee's relationship to the victim.  "In general, an employer is vicariously liable for a hostile environment created by a *supervisor*. [Citation.] However, when no 'tangible employment action' [(i.e., a significant change in employment status, such as discharge, demotion, or undesirable reassignment)], has been taken, an employer may raise 'an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.' " *Nichols v. Azteca Restaurant Enterprises, Inc.,* 256 F.3d 864, 877 (9th Cir. 2001) (quoting *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)) (emphasis added).  "The affirmative defense has two prongs: (1) 'that the employer exercised reasonable care

1  to prevent and correct promptly any sexually harassing behavior'; and (2) 'that the plaintiff

2  unreasonably failed to take advantage of any preventive or corrective opportunities provided by the

3  employer or to avoid harm otherwise.' " *Id*. (quoting *Ellerth, supra,* 524 U.S. at 765).  By contrast,

4  " '[i]f . . . the harasser is merely a *coworker*, the plaintiff must prove that . . . the employer knew or

5  should have known of the harassment but did not take adequate steps to address it.' " *Dawson, supra,*

6  630 F.3d at 939 (quoting *Swinton v. Potomac Corp.,* 270 F.3d 794, 803 (9th Cir. 2001)) (ital. added).

7       In arguing it cannot be held vicariously liable for sexual harassment because no evidence

8  suggests it knew or should have known of Martinez's alleged misconduct, AMR presupposes

9  Martinez and Rangel were nothing more than coworkers.  The Court finds sufficient evidence in the

10  record to question whether this was truly the case.  "An employer is vicariously liable for actions by

11  a supervisor who has 'immediate (or successively higher) authority over the employee.' " *Dawson,*

12  *supra,* 630 F.3d at 940 (quoting *Faragher, supra,* 524 U.S. at 807).  "This distinction 'is not

13  dependent upon job titles or formal structures within the workplace, but rather upon whether a

14  supervisor has the authority to demand obedience from an employee.' " *Id.* (quoting *McGinest v.*

15  *GTE Service Corp.,* 360 F.3d 1103, 1119 n. 13 (9th Cir. 2004)).  AMR contends Martinez could not

16  have been Rangel's supervisor because the evidence shows he, like Rangel, was simply a paramedic

17  who did not have the authority to hire, fire or discipline employees or give raises.  Problematically

18  for AMR, Rangel testified Martinez acted as her supervisor from 2007 to 2008 and that he was

19  present when other supervisors imposed discipline on her.  Rangel further testified Martinez was at

20  one point the shop steward for what was presumably the Porterville bargaining unit of Rangel's

21  union, the National Emergency Medical Services Association (NEMSA), and that he represented her

22  when she was a member of NEMSA.  In light of this evidence, Martinez "could be deemed by a trier

23  of fact as [Rangel's] supervisor even if [AMR] did not define his role that way." *Dawson, supra,*

24  630 F.3d at 940.  Accordingly, AMR cannot meet its initial burden on summary judgment simply

25  by contending it did not know or could not have known of any prior alleged harassment, as it does

26  in proceeding under the assumption Martinez and Rangel were coworkers.  AMR must also present

27

28                                                    9

evidence showing it exercised reasonable care to prevent and correct harassment and that Rangel unreasonably failed to take advantage of any preventive or corrective opportunities, as is required when, as in this case, the evidence suggests the perpetrator was a supervisor. That was not done here.

Even assuming Martinez was merely Rangel's coworker, the Court finds sufficient evidence to suggest, contrary to AMR's contention, it knew or should have known Martinez was harassing other employees. Rangel testified that sometime in 2006 or 2007, prior to the exposure incident, she complained to her supervisors Manny Santonio and Jerry Hensley about Martinez's behavior toward her and others and about how he "call[ed] them names and how he treat[ed] his partners." Rangel further testified that sometime in 2007 or 2008, she complained to her then-shop steward Brian Perez about how Martinez would walk out of the shower with just a towel on. Rangel further testified she complained to Perez sometime in early 2008 about how Martinez would grab her hair and play with it. Based on the foregoing, summary adjudication of the Title VII cause of action must be denied.

***B. Second cause of action (violation of FEHA)*** – AMR further moves for summary adjudication of Rangel's second cause of action for violation of FEHA, Cal. Gov. Code sections 12900 et seq. Incorporating previous allegations by reference, Rangel alleges as follows under this cause of action:

> "[A] substantial or motivating factor in Defendants' discrimination, sexual harassment, and retaliatory termination on or about August 28, 2008, was [Plaintiff's] sex, female, in violation of [FEHA]. [¶] The behavior, conduct and comments by the Defendants created a work environment that was intimidating, hostile, oppressive and offensive to Plaintiff which deprived Plaintiff of the benefit of a discrimination-free work environment, all in violation of California Government Code §§ 12940, et seq. Such conduct on the part of Defendant, Martinez, included, but was not limited to, exposing his genitals to Plaintiff."

Rangel further alleges:

> "Under California Government Code § 12940(k), Defendant, AMR, had a duty to prevent discrimination, sexual harassment and retaliation against Plaintiff and to provide her with a workplace which was free of discrimination and harassment. Defendant, AMR, failed to take reasonable steps to prevent discrimination against and harassment of Plaintiff on the basis of her sex. In fact, AMR knowingly and willfully allowed and condoned a sexually charged workplace."

AMR now contends that, to the extent Rangel intends to claim failure to prevent harassment in

violation of California Government Code § 12940(j) and (k), summary adjudication of this cause of action must be granted because it took reasonable steps to prevent any harassment from occurring. Under FEHA, "[a]n entity shall take all reasonable steps to prevent harassment from occurring," Cal. Gov. Code, § 12940, subd. (j)(1); it is an unlawful employment practice "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent . . . harassment from occurring." *Id*., subd. (k). Because Rangel has met her burden to show genuine issues of material fact as to actionable harassment, AMR may be held liable for failing to prevent it. Thus, to meet its burden on summary judgment, AMR must submit evidence to show it took steps to investigate or prevent harassment.

"[R]easonable steps an employer might take include the establishment and promulgation of anti[-harassment] policies and the implementation of effective procedures to handle complaints and grievances regarding [harassment]." *California Fair Employment and Housing Commission v. Gemini Aluminum Corporation,* 122 Cal.App.4th 1004, 1025, 18 Cal.Rptr.3d 906 (2004) (citing *Northrop Grumman Corp v. Workers' Comp. Appeals Bd.,* 103 Cal.App.4th 1021, 1035, 127 Cal.Rptr.2d 285 (2002)). As support for its contention it took reasonable steps to prevent harassment, AMR points to the declaration of its Human Resources Manager, Theresa Foletta, who testifies, "AMR strictly prohibits harassment or discrimination based on an employee's race, ethnicity, national origin, gender, age, religion, sexual orientation, pregnancy, marital status, medical condition, disability or any other protected characteristic . . . . The collective bargaining agreement between Ms. Rangel's union, NEMSA, and AMR requires that all employees treat each other with dignity, courtesy, trust and respect." Foletta further testifies, "All AMR employees are trained regarding AMR's policies against harassment, discrimination and retaliation. Additionally, employees are advised that they can report or complain of harassment to any supervisor, to any member of management, to human resources, or to a confidential Ethics and Integrity Hotline number that is published in the employee handbook. We encourage employees to report all conduct that is interpreted as harassment and we do not retaliate against employees for doing so. AMR investigates any claim or charge of harassment, and takes prompt remedial action if it concludes that

11

harassment has occurred in the workplace."   AMR also submits copies of (1) its Policies and

Procedures Manual, which contains a section on sexual harassment prevention, and (2) section 23.4

("Workplace Conduct") of the collective bargaining agreement between NEMSA and AMR, which

provides, "The Employer and the Union agree that employees, supervisors, and managers will treat

each other, regardless of position or profession, with dignity, courtesy, trust, and respect." According

to Foletta, violation of section 23.4 by an employee may result in his or her immediate termination.

Ordinarily, the Court might be inclined to agree the foregoing evidence is sufficient to meet

AMR's burden on summary judgment.  Problematically for AMR, an employer's duty to prevent

harassment involves not only "tak[ing] all reasonable steps necessary to prevent . . . harassment from

occurring," Cal. Gov. Code, § 12940, subd. (k), in the first instance, but also "tak[ing] immediate

and appropriate corrective action," *id.*, § 12940, subd. (j)(1), when the employer becomes aware

harassment has occurred.  *See Northrop Grumman Corp., supra,* 103 Cal.App.4th at 1035.  "One

[ ] reasonable step . . . that is required in order to ensure a [harassment]-free work environment, is

a prompt investigation of [a] [harassment] claim."  *Gemini Aluminum Corp., supra,* 122 Cal.App.4th

at 1024 (citing *Northrop Grumman Corp., supra,* 103 Cal.App.4th at 1035).  In addition, "[o]nce an

employer is informed of the sexual harassment, the employer must take adequate remedial measures.

The measures need to include immediate corrective action that is reasonably calculated to 1) end the

current harassment and 2) to deter future harassment. [Citation.] The employer's obligation to take

prompt corrective action requires 1) that temporary steps be taken to deal with the situation while

the employer determines whether the complaint is justified and 2) that permanent remedial steps be

implemented by the employer to prevent future harassment once the investigation is completed."

*Bradley v. California Dept. of Corrections and Rehabilitation,* 158 Cal.App.4th 1612, 1630, 71

Cal.Rptr.3d 222 (2008) (citing, inter alia, *Swenson v. Potter,* 271 F.3d 1184, 1192 (9th Cir. 2001)).

"An employer is required to take remedial action to designed to stop the harassment, even where a

complaint is uncorroborated or where the coworker denies the harassment."  *Id*. at 238.  Engaging

in inferences most favorable to Rangel, it appears AMR knew or should have known Martinez might

have been sexually harassing Rangel and others well in advance of the August 10, 2008 exposure

incident when Rangel complained to Santonio, Hensley and Perez about Martinez's prior conduct.

However, nothing suggests AMR investigated or took any immediate corrective action in response

to *those* complaints; the only investigation and corrective action taken by AMR occurred *after*

August 10, 2008, in response to Rangel's complaint of the exposure incident.  Accordingly, AMR

cannot obtain summary adjudication of Rangel's failure to prevent harassment claim simply by

showing it maintains a comprehensive anti-harassment policy about which it educates its employees.

AMR further contends summary adjudication of the FEHA cause of action must be granted

to the extent Rangel intends to claim retaliation.  FEHA provides it is an unlawful employment

practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person

because the person has opposed any practices forbidden under this part or because the person has

filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov. Code, § 12940,

subd. (h).  "The elements of a claim for retaliation in violation of section 12940, subdivision (h), are

. . . (1) the employee's engagement in a protected activity, i.e., 'oppos[ing] any practices forbidden

under this part'; (2) retaliatory animus on the part of the employer; (3) an adverse action by the

employer; (4) a causal link between the retaliatory animus and the adverse action; (5) damages; and

(6) causation."  *Mamou v. Trendwest Resorts, Inc.,* 165 Cal.App.4th 686, 713, 81 Cal.Rptr.3d 406

(2008).  "Proof of two of these elements – the second and fourth – is likely to depend on

circumstantial evidence, since they consist of subjective matters only the employer can directly

know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action." *Id.*

Because of this, analysis of the retaliation cause of action proceeds under the burden-shifting

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green ,*411 U.S. 792,

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)*.  See Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 354, 100

Cal.Rptr.2d 352, 8 P.3d 1089 (2000); *see also Mamou, supra,* 165 Cal.App.4th at 713-15; *Joaquin*

*v. City of Los Angeles,* 202 Cal.App.4th 1207, 1219-22, 136 Cal.Rptr.3d 472 (2012).  "Under the

three-part *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing a prima facie

case of employment [retaliation]." *Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108, 1112 (9th Cir. 2011) (citing *Noyes v. Kelly Services,* 488 F.3d 1163, 1168 (9th Cir. 2007)).[1] "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests [retaliatory] motive." *Guz ,supra,* 24 Cal.4th at 355. "While the plaintiff's prima facie burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remained unexplained, that it is more likely than not that such actions were based on a [prohibited] [retaliatory] criterion[.]" *Id*. (internal citations and quotations omitted). Once the plaintiff has done so, "a presumption of [retaliation] arises." *Id.* The burden then "shifts to the employer to rebut the presumption by producing admissible evidence . . . that its action was taken for a legitimate, non[retaliatory] reason." *Id.* at 355-56. "If the employer sustains this burden, the presumption of [retaliation] disappears. The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for [retaliation], or to offer any other evidence of [retaliatory] motive." *Guz, supra,* 24 Cal.4th at 356 (internal citations omitted).

This order of proof applies, however, only when retaliation claims are *tried* before a court

---

[1] A plaintiff in a FEHA retaliation case may create genuine issues of material fact by offering direct *or* circumstantial evidence of retaliation. *See Guz, supra,* 24 Cal.4th at 354. "Direct evidence is evidence which, if believed, proves the fact of [retaliatory] animus without inference of presumption. Comments demonstrating [retaliatory] animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue." *DeJung v. Superior Court,* 169 Cal.App.4th 533, 550, 87 Cal.Rptr.3d 99 (2008); cf. *Patten v. Wal-Mart Stores East, Inc.,* 300 F.3d 21, 25 (1st Cir. 2002) (direct evidence " 'consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision' "). If the plaintiff chooses to rely on direct evidence, the three-part test of *McDonnell Douglas* does not apply. *DeJung, supra,* 169 Cal.App.4th at 550; cf. *Guz, supra,* 24 Cal.4th at 354 (the "*McDonnell Douglas* test reflects the principle that direct evidence of [retaliation] is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows [retaliation] to be inferred from facts that create a reasonable likelihood of [retaliation] and are not satisfactorily explained"). Rangel has not pointed to any direct evidence of retaliation in the record. Therefore, the analysis in this case proceeds under the *McDonnell Douglas* framework.

or a jury. *See Guz, supra,* 100 Cal.Rptr.2d at 352.  On summary judgment, the burdens are reversed: "A defendant seeking summary judgment must bear the initial burden of showing that the action has no merit, and the plaintiff will not be required to respond unless and until the defendant has borne that burden." *Martin v. Lockheed Missiles & Space Co.,* 29 Cal.App.4th 1718, 1730, 35 Cal.Rptr.2d 181 (1994) (internal citations and quotations omitted); *accord Department of Fair Employment and Housing v. Lucent Technologies,* 642 F.3d 728, 745 (9th Cir. 2011).  Thus, " '[the employer is] required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, non[retaliatory] reason for [the adverse employment action]." ' *Lucent Technologies, supra,* 645 F.3d at 745 (citing *Avila v. Continental Airlines, Inc.,* 165 Cal.App.4th 1237, 82 Cal.Rptr.3d 440, 449 (2008)).  "If the employer presents admissible evidence that one or more of plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, non[retaliatory] factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing." *Caldwell v. Paramount Unified School Dist.,* 41 Cal.App.4th 189, 203, 48 Cal.Rptr.2d 448 (1995).  "The employee can satisfy its burden by 'produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual.' " *Lucent Technologies, supra,* 642 F.3d at 746 (quoting *Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215, 224, 87 Cal.Rptr.2d 487 (1999)).

The adverse employment action underpinning Rangel's retaliation claim is her August 28, 2008 termination by AMR, which Rangel contends was undertaken in retaliation against her after she complained about the sexual harassment she had received from Martinez as a result of the August 10, 2008 exposure incident.  In attempting to meet its initial burden on summary judgment, AMR does not dispute Rangel engaged in a protected activity or suffered an adverse employment action.  Instead, AMR contends it had a legitimate, nonretaliatory reason for terminating Rangel's employment, and points again to Theresa Foletta's declaration, wherein Foletta testifies as follows:

> "In August 2008, I learned that EMT Deanna Rangel reported that AMR employee Jose Martinez allegedly exposed his genitals to her while on duty out of AMR's Station 20 in Porterville . . . . As a result of Ms. Rangel's complaint, I conducted a prompt and thorough investigation of this matter, interviewing Ms. Rangel, Mr.

Martinez, and several other AMR employees with knowledge or information regarding this matter, and I also obtained written statements from such individuals."

Foletta further testifies:

"As a result, I reached the following conclusions: [¶] Ms. Rangel, who was already on final written warning for her abusive conduct directed at an AMR patient in May 2008, had unnecessarily provoked a confrontation with co-worker Mr. Martinez on August 10, 2008.  By her own admission, she stated that Mr. Martinez 'had no balls.'  This statement was made in an argument between Ms. Rangel and Mr. Martinez in front of another co-worker, and in the context of Ms. Rangel stating that Mr. Martinez had dropped out of the police academy.   Additionally, Mr. Martinez claimed that Ms. Rangel made the 'no balls' statement several times, along with other inappropriate statements.  At the very least, I concluded that it was stated by Ms. Rangel at least once, and that this statement unnecessarily provoked Mr. Martinez. [¶] Mr. Martinez (who had no serious discipline on his record) responded inappropriately to Ms. Rangel's 'no balls' comment by unzipping his trousers."

Foletta further testifies:

"After completing my investigation, I concluded that both Ms. Rangel's and Mr. Martinez's employment should be terminated for violation of Workplace Conduct article 23.5 [sic; 23.4?] of the collective bargaining agreement, which provides that all employees shall treat each other, regardless of position or profession, with dignity, courtesy, trust and respect.  In Ms. Rangel's case, she was already on a final written warning, and her admitted comments to Mr. Martinez were inappropriate.  This recommendation was made to AMR General Manager Cindy Woolston, and we both agreed that the conduct of both Ms. Rangel and Mr. Martinez warranted discharge.  I did not make my recommendation of termination of Ms. Rangel because she reported the incident, and none of the others involved in the termination decision discussed (or considered) Ms. Rangel's report of the alleged exposure as a reason for her termination.  It was all based upon her inappropriate conduct (statements to Mr. Martinez) while she was on a final written warning."

Foletta's testimony establishes Rangel's termination was based not on any prohibited reason, but on legitimate, nonretaliatory factors.  *See Guz, supra,* 24 Cal.4th at 357.  "A reason is ' "legitimate" ' if it is 'facially unrelated to prohibited bias, and which if true, would thus preclude a finding of [retaliation]."  *Reid v. Google, Inc.,* 50 Cal.4th 512, 520 n. 2, 113 Cal.Rptr.3d 327, 235 P.3d 988 (2010) (citing *Guz, supra,* 24 Cal.4th at 358) (emphasis omitted).  Rangel was found to have made inappropriate comments to another employee in violation of AMR's workplace conduct policy.  Violation of company policy is a legitimate, nonretaliatory reason for terminating an employee.  *See Bodett v. CoxCom, Inc.,* 366 F.3d 736, 744-45 (9th Cir. 2004); *Pulczinski v. Trinity Structural Towers, Inc.,* 691 F.3d 996, 1007 (8th Cir. 2012).  Accordingly, the burden shifts to Rangel to offer

16

evidence of retaliatory motive or show the reason for termination was merely pretext for retaliation.

"A plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful [retaliation] more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl, supra,* 658 F.3d at 1112-13 (citing *Chuang v. University of California Davis, Bd. of Trustees,* 225 F.3d 1115, 1127 (9th Cir. 2000)). "When evidence of pretext is circumstantial, rather than direct," as in this case, "the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." *Earl, supra,* 658 F.3d at 1113 (citing *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998)). " 'An employee in this situation can not simply show the employer's decision was wrong, mistaken or unwise.' 'Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-[retaliatory] reasons.' " *Lucent Technologies, supra,* 642 F.3d at 746 (citing *Morgan v. Regents of the Univ. of Cal.,* 88 Cal.App.4th 52, 105 Cal.Rptr.2d 652, 670 (2000)). Having reviewed the pleadings of record and all competent and admissible evidence, the Court finds Rangel has satisfied her burden to demonstrate retaliation by offering evidence her termination was motivated by animus.

To establish pretext, Rangel first contends her comments to Martinez were *not* inappropriate because that was the nature of the job. In a declaration submitted with the opposition, Rangel avers: "Emergency medicine is a very stressful occupation, especially when it is practiced in the field as it is by the EMT[s] and [p]aramedics employed by AMR. Because of the stress involved in the job, and to help relieve it somewhat, during the time between emergency calls AMR's EMT[s] and [p]aramedics often and customarily engage in banter with each other that emergency medicine and other public safety persons who do not work in the field would probably consider crude and insulting. An example of such banter would be for one AMR EMT or [p]aramedic to suggest in crude terms that the personal hygiene habits of another AMR EMT or [p]aramedic did not conform

17

1   to social norms.  Another example would be for one AMR EMT or [p]aramedic to suggest, again

2   in crude terms, that another AMR EMT or [p]aramedic lacked the necessary determination or ability

3   to carry out a particular task.  This back-and-forth banter occurred between AMR field personnel

4   during the entire time that I worked for AMR and, up until the day I was fired, was never identified

5   to me by AMR as being unacceptable or otherwise below the standards AMR desired to set for

6   interactions between its field personnel."  From this, Rangel asserts a reasonable trier of fact could

7   find her termination resulted from retaliatory motive, the implication being, in light of the foregoing

8   circumstances, the explanation offered by AMR that she was terminated because her comments were

9   inappropriate would be inherently unbelievable and, as a result, the impetus behind her termination

10  must necessarily have been retaliation.  Problematically for Rangel, her belief those comments were

11  acceptable because AMR employees made them to each other as a form of stress relief and no one

12  ever told her she could not is hardly sufficient to establish pretext.  *See King v. United Parcel*

13  *Service, Inc.,* 152 Cal.App.4th 426, 433, 60 Cal.Rptr.3d 359 (2007) ("plaintiff's subjective beliefs

14  in an employment [retaliation] case do not create a genuine issue of fact; nor do uncorroborated and

15  self-serving declarations") (citing *Chiaramonte v. Fashion Bed Group, Inc., a Division of Leggett*

16  *& Platt, Inc.,* 129 F.3d 391, 401 (7th Cir. 1997); *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054,

17  1061 (9th Cir. 2002)) ("[T]his court has refused to find a 'genuine issue' where the only evidence

18  present is 'uncorroborated and self-serving testimony").  "[P]laintiff's evidence must relate to the

19  motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link

20  between prohibited motivation and [the adverse employment action.]" *Id*. at 433-34 (citing *Saelzler*

21  *v. Advanced Group 400,* 25 Cal.4th 763, 774, 107 Cal.Rptr.2d 617, 23 P.3d 1143 (2001)).  The

22  above portion of Rangel's testimony shows no link between her termination and retaliatory motive.

23       Rangel further contends the proffered reason for her termination had to have been pretextual

24  because her comments to Martinez could not have qualified as a dischargeable offense under the

25  collective bargaining agreement (CBA) between NEMSA and AMR.  In her declaration, Rangel

26  testifies, "AMR claims to have fired me for violating Section 23.4 of the CBA which, according to

27

28                                                          18

Ms. Folleta's [sic] declaration in support of AMR'[s] summary judgment motion 'can result in immediate termination.' AMR'[s] claim is incorrect. [¶] The CBA provides in Sections 5.1 and 5.2 that my employment with AMR could only be terminated for 'just cause' and that I would generally be subject to progressive discipline such that termination in the first instance would only be warranted for serious or repeated offenses. [¶] My comments to Mr. Martinez on August 10, 2008 did not constitute 'just cause' for AMR to fire me because the comments did not constitute a violation of Section 23.4 of the CBA. [¶] My comments to Mr. Martinez were consistent with the ordinary and customary banter between on-duty AMR employees in Tulare County."  Rangel then proceeds explain to how any discipline she received prior to her termination, including discipline in May 2008 resulting from her interaction with a non-cooperative and combative patient, could also not have constituted "just cause."  Notwithstanding the fact Rangel's subjective and self-serving (1) view of her own behavior and (2) interpretation of the CBA hardly create triable issues, *see King, supra,* 152 Cal.App.4th at 433, her argument misses the point.  Rangel essentially contends AMR mischaracterized her conduct as a serious offense in order to justify terminating her under the language of the CBA.  In doing so, however, Rangel erroneously conflates an adverse employment action (here, a termination) taken for a legitimate, non-retaliatory reason with a termination for cause.  The two are not synonymous, and the possibility AMR might not have had cause to terminate Rangel under the CBA does not mean AMR's *belief* Rangel had violated the CBA was illegitimate.  Rangel has provided no authority – and the Court's research reveals no authority – stating an employer's reason for firing employees must be based on cause to be legitimate and non-retaliatory.  To avoid liability for retaliation, the reason must only be based on grounds not proscribed by FEHA.  *See Loggins v. Kaiser Permanente Intern.,* 151 Cal.App.4th 1102, 1112 n. 7, 60 Cal.Rptr.3d 45 (2007) (citing *Guz, supra,* 24 Cal.4th at 358) ("Requiring the employer to prove at the second stage of the [*McDonnell-Douglas*] analysis that the employment termination was objectively fair appears to be inconsistent with the recognition that an employer is not liable for an employment termination premised on an unwise or incorrect basis, but only if the employment termination was based on a

prohibited reason. [Citation.] To require the employer to go beyond showing a legitimate reason, by requiring the employer to show the termination was 'fair,' would imply that an unfair but otherwise nondiscriminatory employment termination would be actionable.  That is not the law. [Citation.]").

"When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true?" *E.E.O.C. v. Total System Services, Inc.,* 221 F.3d 1171, 1176 (11th Cir. 2000).  The evidence shows AMR conducted an investigation into the August 10, 2008 altercation between Rangel and Martinez and found Rangel's conduct to be inappropriate and in contravention of the CBA's workplace conduct policy providing all employees treat each other with dignity, courtesy, trust and respect.  The evidence further shows AMR terminated Rangel because of the findings made pursuant to the investigation.  In other words, the evidence establishes Rangel's termination resulted from AMR's reasonable *belief* Rangel had acted inappropriately and violated the CBA.  This is key, because whether Rangel did in fact violate the CBA is irrelevant so long as AMR reasonably *believed* she did.  *See King, supra,* 152 Cal.App.4th at 433 (citing *Villiarimo, supra,* 281 F.3d at 1063) ("For purposes of establishing the moving employer's initial burden of proof, it does not matter whether plaintiff actually did commit a[ ] . . . violation as long as [the employer] honestly believed he did").  Accordingly, the issue of whether AMR had sufficient cause to terminate Rangel under the language of the CBA is of no significance as it pertains to pretext because it does not address whether Rangel's conduct sincerely motivated AMR to fire her. Rangel's argument amounts to nothing more than a disagreement with AMR's interpretation of the CBA.  If Rangel is aggrieved because she believes AMR fired her without adhering to the CBA process, the proper cause of action to assert against AMR would be for breach of contract, not FEHA retaliation.

In her declaration, Rangel further testifies, "No other AMR employee to my knowledge has ever been fired for engaging in such banter; in the small EMS community of Tulare County, I would have heard of such a firing had one ever occurred."  To the extent Rangel intends to suggest the proffered reason for her termination was pretextual because other AMR employees were not subject to adverse employment actions even after engaging in conduct similar to hers, the argument fails.

"A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated . . . similarly situated employees more favorably than the plaintiff." *Earl, supra,* 658 F.3d at 1113.  Rangel's testimony, however, hardly qualifies as comparative evidence of disparate treatment, for the simple fact she provides no details about these other employees that would allow a jury to conclude they were similarly situated to her and had engaged in similar violations.  She has not identified who they were, what responsibilities they had in the organization or what it is they did or said.  She has also not shown AMR even knew other employees had "engaged in such banter."

Nevertheless, the Court believes the temporal proximity between Rangel's complaint of the August 10, 2008 exposure incident and her August 28, 2008 termination is sufficient to establish a triable issue as to pretext.  Ordinarily, "[w]here the employee relies solely on temporal proximity in response to the employer's evidence of a nonretaliatory reason for termination, he or she does not create a triable issue as to pretext[.]" *Arteaga v. Brink's, Inc.,* 163 Cal.App.4th 327, 357, 77 Cal.Rptr.3d 654 (2008).  "In some cases," however, "temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case *and* the showing of pretext." *Dawson, supra,* 630 F.3d at 937 (citing *Bell v. Clackamas County,* 341 F.3d 858, 865-66 (9th Cir. 2003)) (emphasis added).  The plaintiff in *Dawson* engaged in a protected activity when he visited his employer's human resources department to discuss derogatory comments other employees had made to him about his sexual orientation and to file a complaint of sexual orientation discrimination. *Id*. at 933, 936.  Less than 48 hours later, he was fired.  Although the employer explained the plaintiff had been fired for failing to comply with its no-show/no-call policy, the court reasoned the timing of the complaint and the termination might not have been coincidental: "Viewing the facts in the light most favorable to Dawson, the protected activity occurred at most two days before the discharge and the treatment of Dawson was a topic during both the protected activity and the discharge, as explained by the supervisor and the human resources person who fired him. The gravity of Dawson's complaint coupled with the time frame are such that a reasonable trier of fact could find in favor of Dawson on his retaliation claim." *Id*. at 933-34, 937.  Similarly, the court

21

in *Bell, supra,* 341 F.3d 858, concluded the temporal proximity (four days) between the plaintiff's complaints of racial comments and racial profiling by other employees, together with his supervisors' contemporaneous displeasure with those complaints, provided strong circumstantial evidence of retaliation entitling a jury to disbelieve the employers' assertion the plaintiff was fired because of substandard job performance. *Id.* at 866.  In this case, like the plaintiffs in *Dawson* and *Bell*, Rangel was fired within days of complaining to AMR about the August 10, 2008 exposure incident.  While it is unclear from the record when exactly Rangel complained, no more than 18 days could have transpired between her complaint and her termination.  Eighteen days is sufficiently close to imply a causal relationship between the protected activity and the adverse employment action. *See Stegall v. Citadel Broadcasting Co.,* 350 F.3d 1061, 1069-70 (9th Cir. 2003) (nine days sufficient); *Argo v. Blue Cross and Blue Shield of Kansas, Inc.,* 452 F.3d 1193, 1202 (10th Cir. 2006) (24 days sufficient).  Furthermore, as with the treatment of the plaintiff in *Dawson*, Martinez's treatment of Rangel was a topic during both the protected activity and the discharge.  AMR does not dispute Martinez's treatment of Rangel was the subject of Rangel's most recent complaint.  And while Foletta declares she "did not make [her] recommendation of termination of Ms. Rangel because [Rangel] reported the [exposure] incident, and none of the others involved in the termination decision discussed (or considered) Ms. Rangel's report of the alleged exposure *as a reason for her termination*" (emphasis added), Martinez's alleged exposure of his testicles to Rangel was very clearly still discussed as part of Foletta's investigation.  How does the Court know this?  Because Foletta, by her own admission, concluded Martinez responded inappropriately to Rangel's comments by unzipping his trousers and that Martinez should also be terminated for violating the CBA's workplace conduct policy.  Foletta could not have made such a finding had she not discussed Martinez's treatment of Rangel during the August 10, 2008 incident.  Under *Dawson*, the temporal proximity between Rangel's complaint and her termination and the fact the subject of the complaint was discussed in the investigation that resulted in the termination is sufficient for (1) Rangel to establish an inference of retaliation (i.e., a prima facie case) and (2) a reasonable trier of fact to infer

AMR's proffered reason for Rangel's termination was pretext for retaliation.  Based on the foregoing, summary adjudication of the FEHA cause of action cannot be granted in favor of AMR.

***C. Third cause of action (defamation - slander per se)*** – AMR and Fischer further move for summary adjudication of Rangel's third cause of action for defamation (slander per se), contending the evidence shows neither AMR nor its representatives made defamatory statements about Rangel. "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' [Citations.]" *Taus v. Loftus,* 40 Cal.4th 683, 720, 54 Cal.Rptr.3d 775, 151 P.3d 1185 (2007).  "A false and unprivileged *oral* communication attributing to a person specific misdeeds or certain unfavorable characteristics or qualities, or uttering certain other derogatory statements regarding a person, constitutes slander." *Shively v. Bozanich,* 31 Cal.4th 1230, 1242, 7 Cal.Rptr.3d 576, 80 P.3d 676 (2003) (italics original).  In addition to false statements causing damage, the California Legislature has specified slander includes a false statement that "1. Charges any person with a crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends to directly injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him impotence or a want of chastity . . . ." Cal. Civ. Code, § 46, subds. 1-4.

Under this cause of action, Rangel alleges: "Defendants, AMR, Martinez and Fisher [sic], through its [sic] agent, AMR, and through its directors officers, partners, agents, owners, employees and alter-egos, acting within the course and scope of their agency or employment, at least in part, caused be published, false and unprivileged communications tending to directly injure Plaintiff in her business and professional reputation.  Specifically, Defendants, and each of them, told others, including subsequent potential employers, expressly or by implication, that Plaintiff was a

problematic, incompetent, insubordinate and untrustworthy employee.  In fact, Plaintiff, was at all times material herein, a competent, loyal, and trustworthy employee. [¶] The defamatory publications consisted of oral and possibly written, knowingly false and unprivileged communications, tending to directly injure Plaintiff and Plaintiff's personal, business and professional reputation.  These publications included the [ ] false and defamatory statements . . . that Plaintiff was mentally unstable, that her interactions with co-workers were 'abrasive,' that her relationships with peers and subordinates were 'severely impaired,' she had violated the employee's sex harassment policy and that she was a poor employee and that she deserved to be terminated.  These and similar statements published by Defendants, and each of them, expressly and impliedly asserted that Plaintiff was unstable and that she was incompetent and a poor employee."  AMR and Fischer now contend no genuine issues of material fact exist as to any of the foregoing allegations.  Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court does not agree.

To meet their burden on summary judgment, defendants first submit the declaration of Fischer, one of the individuals other than Martinez alleged to have made defamatory statements. Fischer testifies, "I am currently employed as an Operations Supervisor for [AMR][.] [¶] In August 2008, I learned that EMT Deanna Rangel reported that AMR employee Jose Martinez exposed his genitals to her while on duty at Porterville Station 20.  I am aware that Human Resources Manager Theresa Foletta conducted an investigation of this matter.  [¶] Apart from conversations with AMR management and Ms. Foletta regarding AMR's investigation of Ms. Rangel's complaint and the Company's decision to terminate both Mr. Martinez and Ms. Rangel, I did not speak to anyone about Ms. Rangel's complaint or the termination of her employment . . . ."  Defendants then assert that to the extent any specific statements made about Rangel might be identified and construed as publications to third parties, truth would be an absolute defense to the defamation claim, arguing, "[I]f Plaintiff asserts that someone slandered her by spreading rumors that she was terminated for inappropriate conduct, such 'rumors' would be true as Plaintiff has admitted provoking Martinez with her 'you have no balls' insult and also admitted to swearing at a mistreating patient in [ ] 2008."

The latter contention – that truth would be an absolute defense – is not ground for summary adjudication in this case. " 'In defamation actions generally, factual truth is a defense which it is the defendant's burden to prove.' " *City of Costa Mesa v. D'Alessio Investments, LLC,* _Cal.Rptr.3d_, 2013 WL 933832 (Cal.App. 4 Dist. 2013), at *10 (quoting *Eisenberg v. Alameda Newspapers, Inc.,* 74 Cal.App.4th 1359, 1382, 88 Cal.Rptr.2d 802 (1999)). However, "[e]ven if a statement is literally accurate, defamation may be proven if it has a false implication." *Hawran v. Hixson,* 209 Cal.App.4th 256, 293, 147 Cal.Rptr.3d 88 (2012). In *Hawran,* the former CFO of a publicly traded diagnostic testing and genetics analysis company, who resigned in reliance on representations he would not be associated with a securities scandal and internal investigation resulting from mishandled research and development results for a fetal Down Syndrome diagnostic test, sued his employer and its directors for defamation after they issued a press release stating, "The company has obtained the resignation of its chief financial officer, Paul Hawran, and one other officer.  While each of these officers and employees has denied wrongdoing, the special committee's investigation has raised serious concerns, resulting in a loss of confidence by the independent members of the company's board of directors in the personnel involved." *Hawran, supra,* 209 Cal.App.4th at 264. The trial court denied defendants' special motion to strike the defamation cause of action under California's anti-SLAPP statute, *see* Cal. Civ. Code, § 425.16, subd. (b)(1), and the Court of Appeal affirmed. *Hawran, supra,* 209 Cal.App.4th at 267, 297.  On appeal, the defendants argued that even assuming the statements in the press release constituted actionable statements of fact, the plaintiff could not prove they were false. The defendants pointed to another employee's statement he had told the plaintiff that the company had serious concerns and had lost confidence in him as well as the plaintiff's own admission it was literally true the other employee had told him in a meeting that the company's board had lost confidence in him.  *Id.* at 293.  The court rejected the defendants' contention.  Finding the statements implied a provable falsehood (i.e., that the plaintiff had committed wrongdoing), the court noted the plaintiff had denied committing any wrongdoing and that his denial was bolstered by the company's SEC Form 8-K filing, which did not suggest the

plaintiff was among the employees in which the company had lost confidence.  From this, the court concluded the plaintiff could demonstrate the statements at issue were false.  *Id*.  In this case, as in *Hawran,* even assuming it could be said the defendants' statement Rangel was terminated for having engaged in inappropriate conduct in violation of AMR's workplace conduct policy was literally accurate, the statement implies a potentially provable falsehood: that Rangel violated AMR's workplace conduct policy.  Thus, the literal accuracy of the statement is not a defense to defamation.

As further ground for summary adjudication, AMR contends statements made by Fischer, Foletta and other AMR employees to the effect Rangel made inappropriate comments and violated AMR's workplace conduct policy would be protected under the common interest privilege embodied in California Civil Code section 47 as long as they concerned Rangel's discipline and termination and were confined to the context of AMR's internal investigation and reporting of Rangel's conduct.  Possibly.  Section 47 provides in pertinent part "[a] privileged publication or broadcast is one made [¶] . . . [¶] (c) [i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."  Cal. Civ. Code, § 47.  "Th[e] common interest privilege is not well-defined, but it has been determined to apply to statements by management and coworkers *to other coworkers* explaining why an employer disciplined an employee."  *McGrory v. Applied Signal Technology, Inc.,* 212 Cal.App.4th 1510, 152 Cal.Rptr.3d 154, 176 (2013) (citing *Deaile v. General Telephone Co. of California,* 40 Cal.App.3d 841, 846, 115 Cal.Rptr. 582 (1974)) (emphasis added).  " 'Clearly, an employer is privileged in pursuing its own economic interests and that of its employees to ascertain whether an employee has breached his responsibilities of employment and if so, to communicate, in good faith, that fact to others within its employ so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in

the past.' " *McGrory, supra,* 152 Cal.Rptr.3d at 176 (quoting *Deaile, supra,* 40 Cal.App.3d at 849).

Although Rangel alleges the defendants made certain statements about her, she has not identified any external, non-AMR-affiliated third parties to whom those statements were communicated and who might have understood them to have a defamatory meaning.  At most, the evidence shows the statements, if any, were made internally within AMR solely for the purpose of reporting and investigating Rangel's alleged misconduct during her August 10, 2008 altercation with Martinez.  This context alone would render the statements subject to the common interest privilege in the absence of any evidence to suggest they were made maliciously.  (In fact, it appears the statements regarding Rangel's conduct and termination were made *only* to the employees charged with investigating and terminating Rangel or to Rangel herself.)  Rangel has not shown any statements made about her arose on an occasion falling outside the scope of the common interest privilege.  Despite this, Rangel first suggests in opposition that the defendants might nonetheless be liable for her foreseeable republication of the statements under California's compulsion doctrine.

Under the compulsion doctrine, a defendant may be liable for the foreseeable republication of a defamatory statement by a plaintiff where "the person defamed [is] operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed."  *McKinney v. County of Santa Clara,* 110 Cal.App.3d 787, 797, 168 Cal.Rptr. 89 (1980).  The doctrine "has been limited to a narrow class of cases, usually where a plaintiff is compelled to republish the statements in aid of disproving them.  Thus, where a derogatory statement is placed in a personnel file, the employee must explain the statement to subsequent employers, who will surely learn of it if they investigate his or her past employment. [Citations.]"  *Live Oak Publishing Co. v. Cohagan,* 234 Cal.App.3d 1277, 1285, 286 Cal.Rptr. 198 (1991).  Rangel alludes to the possibility that because the defendants' alleged statements directly impugned her job performance, which could very well be reflected in her personnel history, she would be required (i.e., compelled) to republish those statements to prospective employers in order

27

to explain away any negative inferences attributable to AMR's proffered reason for her termination.

Problematically for Rangel, the possibility of republication is not sufficient. "California cases that have discussed the [compulsion doctrine] have uniformly involved an *actual* republication. [Citations.]" *Dible v. Haight Ashbury Free Clinics,* 170 Cal.App.4th 843, 855, 88 Cal.Rptr.3d 464 (2009) (emphasis added). *Davis v. Consolidated Freightways,* 29 Cal.App.4th 354, 34 Cal.Rptr.2d 438 (1994), is instructive on this issue. The plaintiff in *Davis*, a former manager of a major freight consolidation terminal who was fired by his employer after an internal investigation revealed he had taken an item from distressed freight – freight separated from a larger shipment – in contravention of the employer's policy holding distressed freight in a storage area until its proper destination can be determined, brought an action against the employer for defamation alleging it published statements he had been fired for theft. *Id*. at 358-59. The trial court granted summary judgment in favor of the employer and the Court of Appeal affirmed. *Id*. at 359, 373-74. On appeal the plaintiff contended there were triable issues whether the employer made defamatory statements to plaintiff under circumstances that forced him to disclose the contents of those statements to future employers who would want to know the circumstances of his termination. *Id*. at 371-72. The court did not agree: "Plaintiff conceded that [employer] had a strictly enforced policy against giving out any information to prospective employers about former employees except their dates of employment. Plaintiff concedes there was no indication that any [ ] representative [of employer] ever discussed the [theft] incident outside [of the company] . . . . Plaintiff never disputed that those conducting the investigations never discussed the incident beyond the scope of their investigations. [¶] . . . Nothing showed that plaintiff had anything he was compelled to explain to prospective employers, and in fact plaintiff never alleged that any prospective employers ever asked him about or asked him to explain the incident. Thus, plaintiff has failed to demonstrate any facts, raising a triable issue of material fact, that he was compelled to republish any defamatory matter." *Id*. at 373. Similarly here, no evidence suggests information relating to Rangel's termination could somehow be revealed by AMR to Rangel's prospective employers. Furthermore, despite Rangel's allegations to the contrary, no

28

evidence suggests any AMR representatives ever discussed the August 10, 2008 incident between Rangel and Martinez or the investigation of and subsequent termination of Rangel *outside of AMR or beyond the scope of the investigation*. Rangel has also failed to show any prospective employers even asked her about the August 10 incident or why she was terminated from AMR. Under these circumstances, Rangel cannot rely on the compulsion doctrine to create a triable issue in this case.

Even if the compulsion doctrine could conceivably apply, it would not resolve the issue of the common interest privilege. Allegedly defamatory statements made by an employee to his or her employer's human resources department recommending termination of another employee fall within the common interest privilege. *Taylor v. San Francisco Unified School Dist.,* 2009 WL 206218 (Cal.App. 1 Dist. 2009) (unpublished), at *8 (and authorities cited).[2] Similarly, "an employer is not liable for defamation if one of its employees advises other employees, such as personnel officers, of a suspicion that [an] employee [committed misconduct] as long as the communication is not motivated by malice." *Kelly v. General Telephone Co.,* 136 Cal.App.3d 278, 286, 186 Cal.Rptr. 184 (1982); *accord Cuenca v. Safeway San Francisco Employees Fed. Credit Union,* 180 Cal.App.3d 985, 995, 225 Cal.Rptr. 852 (1986) ("Communications made in a commercial setting relating to the conduct of an employee . . . fall squarely within the qualified privilege for communications to interested persons"). In her opposition, Rangel appears to concede any statements about her conduct made internally by AMR employees would have arisen in a privileged occasion and that the common interest privilege could conceivably apply, but contends it does not apply here because the evidence suggests the statements about her were made *with* malice, in contravention of subdivision (c) of section 47, which states a publication to an interested party is privileged only if made "*without* malice." Cal. Civ. Code, § 47, subd. (c) (emphasis added). "[F]or purposes of this subdivision, 'malice has been defined as 'a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person.' ' " *McGrory, supra,* 152 Cal.Rptr.3d at 176 (quoting *Brown*

---

[2] The Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau v. Granite State Ins. Co.,* 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003).

*v. Kelly Broadcasting Co.,* 48 Cal.3d 711, 723, 257 Cal.Rptr. 708, 771 P.2d 406 (1989)).  "In other cases, the California Supreme Court has explained: ' " 'The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights [citations].' " ' " *Id*. at 176-77 (quoting *Taus, supra,* 40 Cal.4th at 683) (emphasis original).

As the basis for her contention the common interest privilege does not apply, Rangel relies on an argument she made in attempting to establish AMR's reason for her termination was pretextual – i.e., because her comments to Martinez were simply banter that occurred commonly between AMR employees and had never been identified to her as being unacceptable, they did not constitute just cause to terminate her under the CBA.  From this, Rangel contends the statements made about her in the context of the discipline and termination resulting from her August 10, 2008 altercation with Martinez could only have been "pure fiction," "a patent violation of the CBA," "published with an admitted disregard of who was and was not accurately recounting the events," and thus malicious.

A similar argument was addressed in *McGrory, supra,* 152 Cal.Rptr.3d 154.  Applied Signal Technology, Inc. ("Applied Signal") terminated its four-year employment of John McGrory after an outside investigator hired by Applied Signal concluded that, while McGrory had not discriminated against a lesbian subordinate on the basis of her sex or sexual orientation, he nevertheless violated Applied Signal's policies on sexual harassment and business and personal ethics and had been uncooperative and deceptive during the investigation.  *McGrory, supra,* 152 Cal.Rptr.3d at 158. McGrory brought an action against Applied Signal, asserting, among other things, a claim for defamation in which he alleged he was slandered when at least one of his former coworkers asked why he was terminated and Applied Signal's assistant vice president of human resources, Mike Forcht, answered he had been uncooperative in the investigation despite receiving several warnings about not cooperating.  *Id*. at 160, 176.  The trial court granted summary judgment in favor of Applied Signal, and the Court of Appeal affirmed.  On appeal, McGrory argued Forcht's

communication was not protected by the common interest privilege, contending it was malicious because McGrory's termination did not result from good cause in that Applied Signal had no reasonable ground to believe he did not cooperate during the investigation, as contended. *Id*. at 178.

The Court of Appeal did not agree: "[McGrory's] argument seeks to resurrect the question whether his termination was factually justified. That . . . is [ ] not the relevant question in the context of defamation.  For purposes of establishing a triable issue of malice, 'the issue is not the truth or falsity of the statements but whether they were made recklessly without reasonable belief in their truth.'  [Citation.] A triable issue of malice would exist if Forcht made a statement in reckless disregard of [McGrory's] rights that Forcht either did not believe to be true (i.e., he actually knew better) or unreasonably believed to be true (i.e., he should have known better).  In either case, a fact-finder would have to ascertain what Forcht subjectively knew and believed about the topic at the time he spoke." *McGrory, supra,* 152 Cal.Rptr.3d at 178.  The court continued: "In this case, it is an undisputed fact that [the investigator] reported to [Applied Signal] that [McGrory] did not cooperate with her investigation.  It is also undisputed that, when [McGrory] was terminated, [Applied Signal's] CFO told him that it was due in part to his lack of cooperation in the investigation.  Although it is disputed by [Applied Signal], we will assume for purposes of discussion that Forcht confirmed to a coworker that [McGrory] was terminated for not cooperating with the investigation.  Forcht has subsequently declared that this was one of the reason's for [McGrory's] termination." *Id*.  The court further reasoned: "[McGrory] claims that he was in fact cooperative, but *that is beside the point*.  We see no evidence that Forcht actually believed that [McGrory] was cooperative when Forcht said otherwise.  Nor has [McGrory] produced evidence that no reasonable person could have believed what [the investigator] reported about [McGrory's] lack of cooperation.  She cited several examples of his refusals to answer and misleading statements. [McGrory] has admitted that he misstated a fact and did not answer one of her questions, though he has offered excuses for doing so.  There is no evidence Forcht was aware of [McGrory's] version of [the investigator's] interview when Forcht spoke with [the Applied Signal employee who inquired

about McGrory's termination].  Even if Forcht had been aware of [McGrory's] version, [McGrory] presents no evidence or reason compelling Forcht to have accepted [McGrory's] version and discounted [the investigator's] version. [The investigator's] report therefore provided a reasonable ground for the statement that [McGrory] was uncooperative.  Assuming that Forcht told [the inquiring employee] that [McGrory] was fired for not cooperating with the investigation . . . , [McGrory] has presented no evidence giving rise to a reasonable inference either that Forcht did not believe it when he said [it] or that Forcht's belief was unreasonable." *Id.* at 178-79 (emphasis added).  Accordingly, the court found Forcht's statement was conditionally privileged. *Id.* at 179.

Here, as in *McGrory*, a triable issue of malice could arise only if the evidence suggested Fischer, Foletta and others involved in AMR's investigation of the August 10, 2008 incident between Rangel and Martinez made their alleged statements in reckless disregard of Rangel's rights – that is, either *without the belief* or *with the unreasonable belief* that Rangel's conduct was inappropriate and/or violated AMR's workplace conduct policy.  If the only evidence in this case were Fischer's and Foletta's declarations, the Court might be inclined to agree no triable issue exists on the issue of malice.  As noted above, Foletta's declaration shows she conducted an investigation of the incident and concluded Rangel's actions violated the workplace conduct section of the CBA. In a letter dated August 28, 2008, Foletta informed Rangel: "The Company was advised of allegations of inappropriate behavior and conducted a thorough investigation into these allegations.  The Company has now completed its investigation and has made the decision to terminate your employment effective today. [¶] The grounds for termination include: (i) violation of Workplace Conduct article 23.5 of the CBA[.]"  Foletta reaffirms this was the reason for Rangel's termination in her declaration.  Rangel provides no direct evidence to suggest Fischer or Foletta actually believed Rangel had not violated the CBA.  Rangel also provides no direct evidence to suggest Fischer or Foletta lacked reasonable grounds to believe Rangel's conduct was inappropriate or violative of the CBA. In her declaration, Rangel implies AMR lacked reasonable ground to believe her conduct was inappropriate or violative of the CBA because the conduct was consistent with the ordinary and

customary banter between AMR employees and no one had ever been fired for engaging in conduct similar to hers.  Problematically for Rangel, no evidence suggests AMR knew or should have known its employees were engaging in such conduct or that it was ordinary and customary.  Moreover, the possibility AMR might, for some reason, not have enforced its workplace conduct policy against these employees hardly establishes AMR could not reasonably have viewed their conduct as being inappropriate or contrary to the CBA.  The Court further notes Rangel concedes she did in fact make the comments she was accused of having made to Martinez; she simply disagrees with AMR's interpretation of those comments.  This is quite unlike the situation where an employee denies having engaged in the conduct that is the subject of the alleged defamation.  *See Wetzel v. Getz,* 2004 WL 902189 (Cal.App. 3 Dist. 2004) (unpublished), at *4 (defamation plaintiff's declaration denying he engaged in acts of sexual harassment against defendant coworker sufficient to create triable issue whether coworker maliciously slandered plaintiff in making harassment complaint to employer leading to investigation and plaintiff's termination; "[t]he statements and conduct claimed by defendant in this instance leave no room for interpretation.  Either plaintiff made the statements and grabbed defendant's buttocks or he did not.  If he did not, as plaintiff asserts in his declaration, then defendant had no reasonable grounds for believing otherwise . . . This is enough to establish malice");[3] *Hawran, supra,* 209 Cal.App.4th at 293 (falsity issue where plaintiff denied misconduct).

Rangel's arguments are further problematic with respect to Fischer because the evidence does not reveal exactly what Fischer said about Rangel or what he might have known at the time he made his alleged statements about Rangel.  Accordingly, the Court shall grant summary adjudication of this cause of action in favor of Fischer.  That being said, the Court nonetheless finds sufficient circumstantial evidence in the record from which a reasonable trier of fact could find Foletta's statements to other AMR employees, specifically AMR general manager Cindy Woolston, that Rangel engaged in inappropriate conduct and violated AMR's workplace conduct policy was made

---

[3] Again, the Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau, supra,* 330 F.3d at 1220 n. 8.

without such belief or with an unreasonable belief such that Foletta's statements were malicious. As the Court already concluded in a previous section of this order, sufficient evidence exists for a reasonable trier of fact to conclude AMR's proffered reason for Rangel's termination – namely, that her conduct was improper and violated section 23.4 of the CBA – was not legitimate and nonretaliatory, but pretextual. (This evidence, as discussed above, includes the temporal proximity between Rangel's complaint of the August 10, 2008 exposure incident and her August 28, 2008 termination as well as the fact Martinez's treatment of Rangel was a topic during both the complaint and the discharge.) A finding of pretext would necessarily imply a finding Rangel's conduct was not inappropriate and in violation of section 23.4 and that Rangel should not have been terminated for AMR's proffered reason. And if Rangel did not engage in inappropriate conduct in violation of section 23.4 and should not have been terminated for that reason, Foletta, by extension, could not have believed her statements were true when she told Woolston that Rangel had engaged in inappropriate conduct in violation of section 23.4 and should be terminated. Stated differently, the evidence of pretext suggests that when Foletta made her statements about Rangel, she was fully aware those statements were false. False statements meant to create pretext for an unjustified termination give a trier of fact reasonable basis to find the malice necessary to defeat the common interest privilege.

Lastly, Rangel contends a genuine issue of material fact exists whether Martinez defamed her when he told other AMR employees she was a bitch, whore, worthless, not a good employee and did not deserve to be working as an EMT. In the Court's view, these words, alone, are not actionable.

"For nearly 100 years, courts that have addressed the issue of whether the term 'bitch' is actionable are in nearly universal agreement that it is not." *Culverhouse v. Cooke Center for Learning and Development, Inc.,* 177 Misc.2d 365, 370, 675 N.Y.S.2d 776 (N.Y.Sup. 1998) (and authorities cited therein). "The term 'bitch' is undoubtedly disparaging. But to hold that calling someone a 'bitch' is actionable would require [courts] to imbue the term with a meaning it does not have. Such a holding would, in effect, say that some objective facts exist to justify characterizing

someone as a bitch . . . . 'Bitch' in its common everyday use is vulgar but non-actionable name-calling that is incapable of objective truth or falsity.  A reasonable listener hearing the word 'bitch' would interpret the term to indicate merely that the speaker disliked [the target] and is otherwise inarticulate . . . . Although [this] manner of expression [is] very offensive, our slander laws do not redress offensive ideas." *Ward v. Zelikovsky,* 136 N.J. 516, 537, 643 A.2d 972 (1994).  The Court finds the foregoing reasoning to be persuasive and concludes the term "bitch" is not slanderous per se, but merely a crude and vulgar expression that does not have a natural tendency to injure and therefore cannot underlie a slander claim absent special damages.  Notwithstanding the fact the record sheds no light about the circumstances in which Martinez allegedly used the word "bitch" to refer to Rangel, Rangel provides no evidence she suffered damage, actual or otherwise, as a result.

As to the word "whore," which Rangel contends implies a want of chastity and is therefore slanderous per se under California Civil Code section 46(4), " '[t]wo strong objections' have been lodged against its inclusion in modern definitions of slander per se. [Citation.] One of these – that it unjustifiably discriminates between men and women – does not apply to California's [slander] statute. [Citation.] The other, however, applies with full force: '[M]any forms of sexual activity once regarded as particularly egregious are today thought of in many quarters as not justifying special legal condemnation.' [Citation.] More precisely, the 'want of chastity' which may once have produced widespread opprobrium is now much less likely to do so in many if not most segments of society." *Gonzalez v. Tan Lines,* 2007 WL 3044333 (Cal.App. 6 Dist. 2007) (unpublished), at *10.[4] The Court finds the foregoing reasoning to be persuasive and concludes "whore," like "bitch," is not slanderous per se, but merely a crude and vulgar expression with no natural tendency to injure and therefore cannot underlie a slander claim absent special damages.  Notwithstanding the fact the record sheds no light about the circumstances in which Martinez allegedly used the word "whore" to refer to Rangel, Rangel provides no evidence she suffered damage, actual or otherwise, as a result.

---

[4] Again, the Court may cite unpublished California appellate decisions as persuasive authority. *See Employers Ins. of Wausau, supra,* 330 F.3d at 1220 n. 8.

*Tanya G. v. Adriana's Ins. Services, Inc.,* 2005 WL 2100276 (Cal.App. 2 Dist. 2005) (unpublished), does not persuade the Court differently.  Adriana Fregoso, the owner of Adriana's Insurance Services (AIS), hired Tanya Garcia to work for AIS in 1999.  *Id*. at *1.  According to Garcia, Fregoso's husband Leon made unwanted advances to her during her employment.  In 2003 Fregoso visited Garcia at the office and, in front of her coworkers Mr. Quetcall (first name unknown) and Erika Anaya, called her a slut and a whore and said she knew Garcia was sleeping with Leon. Fregoso added Garcia need not deny it because Leon had confirmed it and she also knew Leon had offered Garcia money to sleep with him.  Fregoso then fired Garcia.  *Id*.  Garcia brought an action against Fregoso and AIS for slander.  The trial court granted Fregoso's motion for nonsuit at the conclusion of her testimony, finding in part "there's insufficient evidence that the two people who heard [Fregoso's] statement reasonably understood the statements to mean that the plaintiff was a whore or a slut or a puta. [¶] They reasonably understood the statements to mean that Mrs. Fregoso was really, really mad, and that doesn't amount to slander." The Court of Appeal reversed.  *Id*. at *2.

In his concurring opinion, which constituted the bulk of the decision, Justice Richard Mosk began by discussing the phrase "[i]mputes . . . a want of chastity" in California's slander per se statute, Cal. Civ. Code, § 46(4): " 'The traditional common law position is that the imputation of unchastity in a woman is slander per se and is actionable without proof of special damages.' [Citation.] Although this rule about the imputation of unchastity has been questioned [citation], the rule remains the law of California and elsewhere. [Citations.] The charge that a woman lacks chastity includes such accusations as the woman is a 'whore' or a 'slut.' [Citations.]" *Tanya G., supra,* 2005 WL 2100276, at *3.  Observing a slander plaintiff is required to prove that the listener to whom an allegedly defamatory statement was published would have understood it in a defamatory sense *only if* the statement happens to be ambiguous, Justice Mosk concluded the statements at issue were plainly defamatory on their face: "[T]he statements concerning Ms. Garcia – that she was a 'slut' and a 'whore' – are slanderous per se.  The meanings of these statements are *unambiguous*.  These words, 'construed according to their normal, ordinary meaning, according to the sense in which the

recipients would normally interpret them' are defamatory. [Citation.] Certainly most people would view those words as derogatory. [¶] . . . Garcia did not have to establish that the specific listeners understood the statements in the defamatory sense." *Id*. at *4 (emphasis added, footnotes omitted).

Justice Mosk emphasized, however, that an allegedly defamatory statement must nevertheless be evaluated within the context in which it was made to determine whether it could be construed as slanderous per se: "Some language that is seemingly defamatory could be understood as 'hyperbole, or loose figurative expression' and therefore not actionable. [Citations.] . . . '[T]he context in which particular words are used thus is again the key to determining whether they are accusations actionable in libel or slander or merely epithets which, as a matter of law, are not.' [Citations.] [¶] To a large extent, 'the deciding inquiry may well be into what the author of the words intended them to mean.' [Citation.]" *Tanya G., supra,* 2005 WL 2100276, at * 4-*5.  Noting Fregoso had testified (1) she believed a "slut" was a "person that goes out with men for money or just a person who likes to be touched and seen and has no morals" and a "whore" was a "person who gives sexual favors in exchange of money," and that (2) she knew Garcia to be a slut and a whore based on rumors and personal experiences she had had with her, *id*. at *2, Justice Mosk concluded: "[Fregoso] intended the statements to mean just what they infer.  And, there is no evidence suggesting that Ms. Fregoso's statements could be understood in any way other than that Ms. Garcia was at best unchaste and at worst, engaging in sex for consideration.  Ms. Fregoso amplified and reinforced these statements in her comments that Ms. Garcia had been sleeping with [Leon] and that he had offered money to Ms. Garcia to sleep with him.  The words have a 'plain and natural meaning as persons of ordinary intelligence would understand,' which is a test that '[b]oth judges and juries are to go by.'" *Id*. at *5.

While the term "whore" may impute a want of chastity and thereby constitute defamation in certain contexts, in other contexts the term may be nothing more than "the kind of rhetorical hyperbole, epithets and figurative statements that are nonactionable."  *Ruiz v. Harbor View Community Association,* 134 Cal.App.4th 1456, 1472, 37 Cal.Rptr.3d 133 (2005).  Even assuming the Court were to agree Martinez's alleged statement calling Rangel a whore could conceivably

amount to slander per se, the context in which it was spoken must at least suggest it could be perceived not as rhetorical hyperbole but as charging Rangel with a want of chastity. The evidence here provides *no* context for Martinez's statement. Under these circumstances, no reasonable trier of fact find the statement reasonably susceptible of a defamatory meaning and/or slanderous per se.

The Court further finds Martinez's alleged statements Rangel was worthless, not a good employee and did not deserve to be working as an EMT constitute non-actionable opinion. " 'The sine qua non of recovery for defamation . . . is the existence of a falsehood.' [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as [defamation], statements of opinion are constitutionally protected. [Citation.]" *McGarry v. University of San Diego,* 154 Cal.App.4th 97, 112, 64 Cal.Rptr.3d 467 (2007). In determining whether a statement is fact or opinion, the critical question is " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' " *Id*. at 113 (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18-19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)). "[I]t is entirely appropriate for the court to determine in the first instance 'whether the publication could reasonably have been understood to have a [defamatory] meaning.' [Citations.]" *Jensen v. Hewlett-Packard Co.,* 14 Cal.App.4th 958, 969, 18 Cal.Rptr.2d 83 (1993).

To determine whether a statement constitutes actionable fact or non-actionable opinion, courts employ a totality of the circumstances test. "Under the totality of the circumstances test, '[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered.' " *McGarry, supra,* 154 Cal.App.4th at 113 (quoting *Baker v. Los Angeles Herald Examiner,* 42 Cal.3d 254, 260-61, 228 Cal.Rptr. 206, 721 P.2d 87 (1986)). In doing so, courts " 'must "look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." [Citation.]' " *Campanelli v. Regents of University of California,* 44 Cal.App.4th 572, 578, 51 Cal.Rptr.2d 891 (1996) (quoting

*Hoffman Co v. E.I. Du Pont de Nemours & Co,* 202 Cal.App.3d 390, 398, 248 Cal.Rptr. 384 (1988)).

Having applied the totality of the circumstances test, the Court finds no basis for a reasonable trier of fact to conclude Martinez's alleged statements were anything other than non-actionable opinion. Nothing in the evidence reveals the nature and content of the communication in which the statements were made or the knowledge and understanding of Martinez's alleged audience. Without such context it is essentially impossible to find the statements implied a provably false assertion of fact. In her opposition, Rangel suggests the statements she was worthless, not a good employee and did not deserve to be working as an EMT tended to directly injure her in respect to her profession by imputing to her a general disqualification in that respect and thereby constituted slander per se under California Civil Code section 46(3). This claim fails for the same reason it fails when predicated on the statements Rangel was a bitch and a whore – namely, no evidence has been provided to the Court establishing the context in which Martinez allegedly uttered the statements.

Accordingly, there are no triable issues whether Martinez defamed Rangel. Nevertheless, because the Court has already found a triable issue whether Foletta defamed Rangel, summary adjudication of the third cause of action for defamation cannot be granted in favor of AMR.

**D. Fourth cause of action (wrongful discharge in violation of public policy)** – AMR further moves for summary adjudication of Rangel's fourth cause of action for wrongful discharge in violation of public policy, contending the claim fails for the same reason it contends the retaliation claim fails.

In California, claims of wrongful termination in violation of public policy were first recognized in *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) and are known as *Tameny* claims. "*Tameny* claims permit wrongful termination damages when a termination is undertaken in violation of a fundamental, substantial and well-established public policy of state law grounded in a statute or constitutional provision." *Kelly v. Methodist Hospital of Southern California,* 22 Cal.4th 1108, 1112, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000). Rangel essentially claims she was terminated for complaining about Martinez's allegedly unlawful

sexual harassment. "Since 1985, [ ] FEHA has prohibited sexual harassment of an employee," *Hughes v. Pair,* 46 Cal.4th 1035, 1042, 95 Cal.Rptr.3d 636, 209 P.3d 963 (2009) (citing Cal. Gov. Code, § 12940, subd. (j)(1)), and " 'the prohibition against sexual harassment includes protection from a broad range of conduct, ranging from expressly or impliedly conditioning employment benefits on submission to or tolerance of unwelcome sexual advances, to the creation of a work environment that is hostile or abusive on the basis of sex.' " *Lyle v. Warner Bros. Television Productions,* 38 Cal.4th 264, 277, 132 P.3d 211 (2006) (quoting *Miller v. Department of Corrections,* 36 Cal.4th 446, 461, 30 Cal.Rptr.3d 797, 115 P.3d 77 (2005)). "These prohibitions represent a fundamental public policy decision regarding 'the need to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination,' " *Lyle, supra,* 38 Cal.4th at 277 (quoting *Brown v. Superior Court,* 37 Cal.3d 477, 485, 208 Cal.Rptr. 724, 691 P.2d 272 (1984)). Courts have recognized *Tameny* claims where an employee alleges she was terminated in retaliation for reporting to her employer or a government agency reasonably suspected unlawful conduct by the employer or other employees. *See, e.g., Casella v. Southwest Dealer Services, Inc.,* 157 Cal.App.4th 1127, 1141-42, 69 Cal.Rptr.3d 445 (2007); *Haney v. Aramark Uniform Services, Inc.,* 121 Cal.App.4th 623, 643, 17 Cal.Rptr.3d 336 (2004); *Jie v. Liang Tai Knitwear Co.,* 89 Cal.App.4th 654, 661-62, 107 Cal.Rptr.2d 682 (2001); *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App.4th 1137, 1150-51, 37 Cal.Rptr.2d 718 (1995); *Holmes v. General Dynamics Corp.,* 17 Cal.App.4th 1418, 1426, 22 Cal.Rptr.2d 172 (1993); *Blom v. N.G.K. Spark Plugs, Inc.,* 3 Cal.App.4th 382, 388-89, 4 Cal.Rptr.2d 139 (1992); and *Collier v. Superior Court,* 228 Cal.App.3d 1117, 1119, 279 Cal.Rptr. 453 (1991). A FEHA violation may support the claim. *City of Moorpark v. Superior Court,* 18 Cal.4th 1143, 1160-61, 77 Cal.Rptr.2d 445, 959 P.2d 752 (1998); *see Stevenson v. Superior Court,* 16 Cal.4th 880, 895-96, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (1997).

To establish a claim for wrongful termination in violation of public policy, a plaintiff must show (1) an employer-employee relationship, (2) the defendant subjected the plaintiff to an adverse employment action, (3) the adverse employment action violated public policy and (4) caused the

plaintiff harm. *Haney v. Aramark Uniform Services, Inc.,* 121 Cal.App.4th 623, 641, 17 Cal.Rptr.3d 336 (2004). As with the retaliation claim, analysis of the wrongful termination cause of action proceeds under the *McDonnell Douglas* burden-shifting framework on motion for summary judgment. *See Loggins, supra,* 151 Cal.App.4th at 1108-1109. AMR now contends summary adjudication must be granted on the same ground it raised in response to Rangel's retaliation claim – namely, because it had a legitimate, non-retaliatory reason for terminating Rangel's employment. Problematically for AMR, the Court has already found sufficient evidence from which a reasonable trier of fact could conclude the proffered reason for Rangel's termination was merely pretext designed to disguise discriminatory animus harbored in violation of FEHA's anti-retaliation provisions. Such a finding would necessarily imply the wrongfulness of Rangel's termination. Accordingly, because the Court has denied summary adjudication of the retaliation claim, summary adjudication must also be denied as to the cause of action for wrongful termination. *Cf. Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215, 229, 87 Cal.Rptr.2d 487 (1999) ("[B]ecause Hanson's FEHA claim fails, his claim for wrongful termination in violation of public policy fails").

**E. Fifth cause of action (sexual battery in violation of California Civil Code § 1708.5)** – AMR further moves for summary adjudication of Rangel's fifth cause of action for sexual battery in violation of California Civil Code section 1708.5, which provides in pertinent part as follows:

> "(a) A person commits a sexual battery who does any of the following: [¶] (1) Acts with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with that person directly or indirectly results. [¶] (2) Acts with the intent to cause a harmful or offensive contact with another by use of his or her intimate part, and a sexually offensive contact with that person directly or indirectly results. [¶] (3) Acts to cause an imminent apprehension of the conduct described in paragraph (1) or (2), and a sexually offensive contact with that person directly or indirectly results."

Cal. Civ. Code, § 1708.5. Under this cause of action, Rangel alleges, "Defendant, Martinez, an agent of Defendant, AMR, repeatedly and wantonly intended to cause harmful and offensive contact with various parts of Plaintiff's body. [¶] . . . Defendant, AMR, knew and/or should have known of Martinez's history and propensities to prey upon female co-workers, and failed to act even after

Plaintiff notified AMR of Martinez's wrongful conduct." AMR contends summary adjudication of this cause of action must be granted in that no battery could be actionable against AMR because it would have been outside the course and scope of Martinez's employment and, in any case, Rangel's claim would be barred by the workers' compensation exclusivity provisions of the California Labor Code. In her opposition, Rangel now concedes Martinez never made direct or indirect contact with her when he exposed his testicles and thus no sexual battery occurred. Accordingly, summary adjudication of the fifth cause of action for sexual battery must be granted in favor of AMR.

**F. Prayer for punitive damages** – As a final matter, AMR moves for summary adjudication of Rangel's prayer for punitive damages, contending there is no evidence to suggest any of its officers, directors or managing agents engaged in oppressive, fraudulent or malicious conduct in connection with Rangel's alleged harassment/termination. "In an action for breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ. Code, § 3294, subd. (a). "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. *With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression must be on the part of an officer, director, or managing agent of the corporation*." *Id*., § 3294, subd. (b) (emphasis added).

At this point the only state law causes of action still remaining against AMR are Rangel's second and fourth causes of action for violation of FEHA and wrongful termination in violation of public policy, respectively, for which punitive damages *are* recoverable. *Commodore Home Systems, Inc. v. Superior Court,* 32 Cal.3d 211, 220, 221, 185 Cal.Rptr. 270, 649 P.2d 912 (1982)

("California law long has recognized that discharges in violation of public policy may be actionable torts for which punitive damages can be recovered under Civil Code section 3294;" "in a civil action under [ ] FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained").   FEHA imposes a negligence standard of liability on employers for acts of harassment committed by an employee who is not an agent or supervisor and a strict liability standard for acts of harassment committed by an employee who is an agent or a supervisor.   *State Dept. of Health Services v. Superior Court,* 31 Cal.4th 1026, 1041-42, 6 Cal.Rptr.3d 441, 79 P.3d 556 (2003).   Similarly, an action for wrongful discharge in violation of public policy lies against an employer for misconduct committed by an employee by virtue of the agency relationship between the employer and employee.   *Miklosy v. Regents of University of California,* 44 Cal.4th 876, 900, 80 Cal.Rptr.3d 690, 188 P.3d 629 (2008).   Irrespective of the foregoing observations, the Court further notes a corporation such as AMR "is a legal fiction that cannot act except through its employees or agents[.]"   *Kight v. CashCall, Inc.,* 200 Cal.App.4th 1377, 1392, 133 Cal.Rptr.3d 450 (2011).   In light of these principles, Rangel's state law causes of action necessarily constitute torts "based upon acts of an employee of the employer," Cal. Civ. Code, § 3294, subd. (b), such that her prayer for punitive damages is governed by that subdivision.   Because AMR is a corporation, the evidence must demonstrate an officer, director or managing agent of AMR committed, authorized or ratified an act of malice, oppression or fraud to create a genuine issue of fact on punitive damages.

Having reviewed the pleadings of record and all competent and admissible evidence submitted, the Court first finds, contrary to AMR's contention, that a reasonable trier of fact could conclude a managing agent of AMR's was directly involved in the decision to terminate Rangel. Martinez, Fischer and Foletta are the three AMR employees identified by Rangel as having committed the misconduct alleged in the complaint.   Notwithstanding the fact Martinez had no involvement in the decision to terminate Rangel, it is essentially undisputed Martinez was not an officer, director or managing agent of AMR.   While Fischer and Foletta were involved in the decision to terminate Rangel, it is undisputed they were not officers or directors.   Sufficient evidence

43

exists, however, to suggest Foletta may have been working for AMR in a managing agent capacity.

"[B]y selecting the term 'managing agent,' and placing it in the same category as 'officer' and 'director,' the Legislature intended to limit the class of employees whose exercise of discretion could result in a corporate employer's liability for punitive damages." *White v. Ultramar, Inc.,* 21 Cal.4th 563, 573, 88 Cal.Rptr.2d 19, 981 P.2d 944 (1999). "[T]he Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy. Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents. Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees. In order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." *White, supra,* 21 Cal.4th at 577. In *White*, a wrongful termination case, the California Supreme Court found Lorraine Salla, Ultramar's zone manager and the employee who fired the plaintiff, to be a managing agent of Ultramar because she (1) managed eight stores and at least sixty-five employees, (2) had individual store managers report to her and (3) reported to department heads in the corporation's retail management department: "Salla's supervision of plaintiff and her ability to fire him alone were insufficient to make her a managing agent. Nonetheless, viewing all the facts in favor of the trial court judgment, . . . Salla was a managing agent . . . [¶] . . . [¶] The supervision of eight retail stores and sixty-five employees is a significant aspect of Ultramar's business. The testimony of Salla's superiors establishes that they delegated most, if not all, of the responsibility for running these stores to her. The fact that Salla spoke with other employees and consulted the human resources department before firing plaintiff does not detract from her admitted ability to act independently of those sources. In sum, Salla exercised substantial discretionary authority over vital aspects of

44

Ultramar's business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy. In firing White for testifying at an unemployment hearing, Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of Ultramar's business." *White, supra,* 21 Cal.4th at 577.

At first glance it appears both Fischer and Foletta, unlike Salla, did not or could not exercise substantial discretionary authority over decisions that ultimately determined corporate policy in any aspect of AMR's business. The only evidence of their responsibilities at AMR comes from their declarations. Inasmuch as his job description is concerned, Fischer's declaration states nothing more than he was an "operations supervisor" for AMR. This is clearly insufficient for one to infer Fischer was anything more than a supervisor. As to her job description, Foletta merely testifies as follows:

> "As a Human Resources Manager for AMR, I was and am familiar with AMR's employment policies and practices. My primary job duties include assisting Company managers with regard to hiring, discipline and performance management, training personnel regarding AMR's policies and procedures (including the Company's anti-harassment/discrimination policies and its standards of conduct), conducting investigations regarding personnel matters, and the oversight of normal human resources functions. As a human resources manager, I also have access to and control over the personnel files of employees within my jurisdiction, including the files of Plaintiff Deanna Rangel and Defendant Jose Martinez."

Considered in isolation, the foregoing testimony establishes Foletta was a lower-level manager with authority "over only one narrow area," *Cruz v. Homebase,* 83 Cal.App.4th 160, 168, 99 Cal.Rptr.2d 435 (2000), of AMR's operations – namely, assisting with human resource tasks and conducting personnel investigations. Nothing in this limited testimony suggests Foletta "exercised authority over corporate principles or rules of general application in the corporation," *id.,* or was "in a policy-making position." *Kelly-Zurian v. Wohl Shoe Co.,* 22 Cal.App.4th 397, 422, 27 Cal.Rptr.2d 457 (1994). If this testimony were the extent of the evidence regarding Foletta's authority, the Court would be inclined to agree Foletta was not AMR's managing agent for purpose of punitive damages.

However, the analysis does not end there. " '[T]he determination whether employees act in a managerial capacity . . . does not necessarily hinge on their "level" in the corporate hierarchy.' [Citation.] . . . [C]orporate liability should not turn on any official title, but on the extent of

discretion conferred on the employee by the corporation." *White, supra,* 21 Cal.4th at 579 (concurring opinion of Mosk, J.) (quoting *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 822, 169 Cal.Rptr. 691, 620 P.2d 141 (1979)). "[I]n no event should a corporation be permitted to shield itself from liability by the expedient of a having a pro forma official policy – issued by high-level management – while conferring broad discretion in lower-level employees to implement company policy in a discriminatory or otherwise culpable manner.  It is what the company *does* – including through the discretionary acts of its employees – not just what it *says* in a stated or written policy, that matters." *White, supra,* 21 Cal.4th at 583 (conc. opn. of Mosk, J.) (emphasis original).  In his concurring opinion in *White,* Justice Stanley Mosk observed that under California Supreme Court precedent, lower-level employees may be found to "possess[ ] broad supervisory and decisionmaking authority" where " '[t]he authority exercised by [the ( ) employees] necessarily results in the ad hoc formulation of policy.' " *Id*. at 579 (quoting *Egan, supra,* 24 Cal.3d at p. 823).

The plaintiff in *Egan,* the first decision cited by Justice Mosk (and also authored by him), obtained a judgment awarding compensatory and punitive damages against his insurer for breach of contract and breach of the implied covenant of good faith and fair dealing arising out of misconduct committed by the insurer's claims manager and claims adjuster relating to an inadequate investigation and delayed payments made in response to the plaintiff's claim for benefits under his health and disability policy. *Egan, supra,* 24 Cal.3d at 814-17.  At trial the evidence showed that in response to the plaintiff's request for additional payments resulting from his continued inability to work, the claims manager visited the plaintiff's home and, although aware of the plaintiff's good faith efforts to work, called him a fraud, told him he only sought benefits because he did not want to work, advised him he was not entitled to any past or future benefits and laughed at him when he expressed concern regarding the need for money during the approaching Christmas season. *Id*. at 821.  The evidence further showed the claims adjuster likewise visited the plaintiff after he made further requests for disability payments, told him he was not incapacitated from any injury but had a "sickness" that did not qualify under the policy's total disability provision and, despite the lack of

46

support for denying the plaintiff's claim, offered him a "final" check under the policy's sickness provision or a larger check if the plaintiff would surrender the policy.  Furthermore, both the claims manager and claims adjuster knew the plaintiff had a minor child and a disabled wife.  *Id*. at 821-22.

On appeal the insurer argued neither the claims manager nor the claims adjuster could be considered "managerial employees" for the purpose of punitive damages under section 3294 because they were not involved in "high-level policy making."  *Egan, supra,* 24 Cal.3d at 822.  The court rejected this contention: "[T]he critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.  When employees dispose of insureds' claims with little if any supervision, they possess sufficient discretion for the law to impute their actions concerning those claims to the corporation."  *Id*. at 822-23.  The court then reasoned: "We are satisfied that with respect to plaintiff's claim herein, the authority vested in [the claims manager] and [the claims adjuster] was sufficient to justify the imposition of punitive damages against Mutual.  The record demonstrates they exercised broad discretion in the disposition of plaintiff's claim.  Moreover, [the manager's] own description of his responsibilities at Mutual reflect his exercise of policy-making authority as a 'managerial employee.'  He testified that his business card displayed to policyholders identified him as 'Manager, Benefits Department, Mutual of Omaha.'  He further explained he was manager of the Los Angeles claims  department for Mutual, and in that capacity had ultimate supervisory and decisional authority regarding the disposition of all claims, like that of plaintiff, processed through the Los Angeles office.  Although [the claims adjuster] testified that he acted with directions from above, the record provides little support for this testimony; it appears, therefore, that with respect to plaintiff's claim he also possessed broad discretion.  The authority exercised by [them] results in the ad hoc formulation of policy."  *Id*. at 823.

In *Agarwal v. Johnson,* 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58 (1979) (disapproved of by *White, supra,* 21 Cal.4th at 575 n. 4), the second decision cited by Justice Mosk in his concurring opinion in *White* (and, like *Egan*, also authored by him), the former employee of a corporation obtained an award of compensatory and punitive damages against his employer and

47

supervisors for defamation and intentional infliction of emotional distress arising out of the supervisors' misconduct. *Agarwal, supra,* 25 Cal.3d at 938-44. On appeal the employer and supervisors contended the jury instructions on punitive damages constituted reversible error because the instructions failed to distinguish between the employer's compensatory and punitive damage liability for the willful and malicious torts of employees. *Id*. at 947-48. In particular, they contended the jury was misled because the instruction "completely failed to recite or even mention the additional elements necessary to make an employer liable for [p]unitive damages[.]" *Id*. at 949-50. Acknowledging an employer may be held liable for an employee's torts under the doctrine of respondeat superior but that its liability for punitive damages requires a finding of one or more of the elements now codified in section 3294, *see id.* at 950, the court nevertheless concluded that even if the proper standard had been articulated to the jury, there was no reason to believe a different verdict would have resulted because it was clear the supervisors were "employed in a managerial capacity." *Id*. at 951-52. One supervisor was the manager of the corporation's project services, which was comprised of 20-25 employees in three departments (estimating, cost control and scheduling). The other was his assistant and supervisor of the cost control department, which gathered information on the status of the corporation's various projects and assembled engineering cost reports. Both supervisors had the authority and discretion to alter the conditions of plaintiff's employment, including assigning him to various projects; changing his office location; denying him permission to attend seminars; and terminating him for "lack of cooperation and lack of job knowledge." *Id*. at 939-44. From this and other evidence, the court reasoned, "Although it is blandly asserted that [the supervisors] were lower in [the employer's] hierachy than other corporate officials who participated in Agarwal's discharge, the fact remains that they were directly responsible for supervising Agarwal's performance and had the most immediate control over the decision to terminate him . . . [A]uthority vested in [the supervisors] regarding the decision to discharge Agarwal was sufficient to support the imposition of punitive damages against [the employer]." *Id*. at p. 952.

The majority in *White* disapproved of *Agarwal* to the extent it implied supervisors could be

managing agents as long as they had the ability to hire and fire employees. *White, supra,* 21 Cal.4th at 575 n. 4; *see Kelly-Zurian, supra,* 22 Cal.App.4th at 422 (company administrator who directly supervised and had the power to terminate plaintiff not in a "policy-making position" and therefore not a managing agent). However, the majority essentially found the Legislature's amendments to section 3294 further refining the requirements for employer punitive damage liability did not abrogate the general rule in *Egan* and *Agarwal* that a corporation may be held liable for punitive damages arising out of the misconduct of employees vested with discretion to make decisions determining corporate policy. *See White, supra,* 21 Cal.4th at 571-77. Indeed, Justice Mosk, applying the rule of *Egan* and *Agarwal* to the facts in *White,* reached the same conclusion as the majority, albeit for slightly different reasons: "Salla, the supervisor who made the initial decision to terminate plaintiff in retaliation for testifying at an unemployment compensation hearing, was a 'zone manager' responsible for overseeing operations of several convenience stores in the San Diego area. As such, she was not a high-level manager or final policy maker for Ultramar, . . . a large corporation that operates a chain of stores and gasoline service stations throughout California. In effect, she was a[ ] local supervisor; indeed, according to the testimony of her supervisors, she apparently lacked the authority to terminate plaintiff without the approval of Ultramar's human resources manager and division manager. Nor did she purport to set any firm-wide or official policy concerning termination of employees for testifying at unemployment hearings. Like the employees in *Egan* and *Agarwal*, however, she *exercised authority that 'necessarily result[ed] in the ad hoc formulation of policy' that adversely affected plaintiff*. [Citation.] Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another Ultramar employee. A corporate manager with such authority may fairly be deemed a managing agent under Civil Code section 3294, subdivision (b)." *White, supra,* 22 Cal.4th at 580 (conc. opn. of Mosk, J.) (emphasis added); compare *id.* at 577 (concluding Salla exercised substantial discretionary authority over vital aspects of Ultramar's business that included managing numerous stores on a daily basis and making decisions that affected both store and company policy).

1    Justice Mosk further recited half a dozen appellate court decisions, chief among them *Siva*

2    *v. General Tire & Rubber Co.,* 146 Cal.App.3d 152, 194 Cal.Rptr. 51 (1983), that, consistent with

3    *Egan* and *Agarwal*, have concluded a corporate employee may be found to be a managing agent

4    where his or her actions result in the ad hoc formulation of policy.  Michael Siva prevailed against

5    his employer, General Tire Service Company ("General"), on a strict liability theory after he was

6    injured while inflating a defectively repaired tire.  *Id.* at 154.  General had shipped a heavy

7    equipment tire manufactured by another company from its San Diego retail outlet to its Los Angeles

8    plant to be recapped and retreaded.  Several operators worked on the tire.  One operator removed the

9    damaged portion of the tire's casing; another applied a patch after inspecting the removal.  A third

10   operator viewed the work performed by the first two operators, and a fourth operator performed the

11   sectional repair.  Bannish, the plant manager, frequently observed operations from the floor.  *Id.* at

12   155.  After the tire was repaired, General shipped it from Los Angeles back to the San Diego outlet,

13   where it exploded upon inflation, injuring Siva.  Bannish inspected the tire after the accident but

14   "couldn't come up with anything."  Despite this, the tire was shipped to General's Akron, Ohio plant

15   and placed on display for retread plant managers as an example of poor quality control.  *Id.* at 156.

16       On appeal General argued there was insufficient evidence to support the punitive damages

17   award.  *See Siva, supra,* 146 Cal.App.4th at 154.  The court agreed the operators' conduct could not

18   underlie the award.  Despite finding there was sufficient evidence the operators' conduct manifested

19   a conscious disregard of the probability their conduct would result in injury to others, the court found

20   no evidence the operators had discretion to exceed General's written standards for repairs of the type

21   above.  Accordingly, the operators could not have been acting in a managerial capacity.  *Id.* at 159.

22   The court concluded, however, that Bannish did act in a managerial capacity.  *Id.*  General had

23   admitted in responses to written interrogatories that each tire was inspected before it was repaired

24   and a written report of the inspection was made.  Bannish testified, however, that no written report

25   was available for the tire at issue and no reports were introduced at trial.  *Id.* at 155.  Based on this

26   evidence, the court reasoned: "The jury could reasonably infer from the conflict in Bannish's

27

28                                              50

testimony and General's interrogatory responses that Bannish knew the extent of damage to the tire but failed to write an inspection tag.  The jury then could have concluded that because at least two and possibly several other workers saw the extent of the repairs, there was an implicit local policy to disregard General's written standards.  General demonstrated this tire to all its plant managers as an example of poor quality control.  The jury could thus infer the Los Angeles plant disregarded the corporation's specifications.  Where there are production errors followed by other serious errors in a setting which indicates the managers are simply not looking at the final product, a jury can properly find the managers have instituted a policy which tacitly approves the work done.  The tacit approval of misconduct in the circumstances of this case constitutes ratification of [misconduct]." *Id*. at 159.

The Court is persuaded by the reasoning of *Egan, Agarwal, Siva* and Justice Mosk's concurring opinion in *White* and finds that under those decisions, sufficient evidence exists for a reasonable trier of fact to conclude Foletta acted as a managing agent for AMR because she had discretion to exceed the terms of the CBA in formulating her own local, ad hoc policy for the termination of employees.  Throughout the motion, AMR repeatedly emphasizes Rangel's conduct during her August 10, 2008 altercation with Martinez violated section 23.4 of the CBA ("Workplace Conduct"), and that a violation of section 23.4 may result in immediate termination.  From this, AMR suggests Foletta was simply following (and applying) standard company policy when she concluded, pursuant to her investigation, that Rangel should be terminated for having violated section 23.4.  Problematically for AMR, article 5, section 5.1 of the CBA ("Corrective Action and Discharge") provides "[t]he Employer [AMR] shall have the right to issue corrective action and discharge employees *for just cause*."  (Emphasis added.)  Nowhere in the CBA does it state a violation of section 23.4 constitutes just cause to discharge an employee.  And nowhere in the CBA does it even state a violation of section 23.4 may result in immediate termination.  In fact, the only evidence a violation of section 23.4 could result in an employee's termination comes from a single statement in Foletta's declaration a "[v]iolation of Section 23.4 can result in immediate termination." The most compelling inference under these circumstances is Foletta was creating rules on her own.

In the Court's view, Foletta had significant responsibility in handling disciplinary issues and enforcing AMR's workplace conduct policy.  For one, it appears she exercised substantial discretion in conducting HR investigations.  In response to the August 10, 2008 incident, she interviewed Rangel, Martinez and several other AMR employees who purportedly had knowledge or information about the situation.  She also obtained written statements from each of these individuals.  Nothing suggests her ability to determine who to interview, for how long, with or without another managerial employee present or whether to obtain written statements was limited in any respect.  For another, it appears she exercised substantial discretion in interpreting the CBA's provisions.  Pursuant to her investigation she concluded Rangel's comments to Martinez violated section 23.4's pronouncement that all employees treat each other with dignity, courtesy, trust and respect.  But in her declaration, she provides no explanation, reasoned or otherwise, to justify why she believed Rangel's conduct was sufficiently undignified, discourteous, distrustful and/or disrespectful to constitute a basis for discharge, and nothing in the record provides any insight as to how she might have reached that conclusion at the time.  AMR points to no written policies governing how employees were to be investigated and terminated and from which Foletta might have drawn guidance.  Furthermore, nothing suggests some person other than Foletta even had any input at all during this entire process.

AMR suggests Foletta cannot be deemed a managing agent because it is unclear from the evidence whether she or another AMR employee, general manager Cindy Woolston, had the ultimate authority to terminate Rangel.  (Foletta testifies she simply "recommend[ed]" to Woolston Rangel be fired and that both she and Woolston agreed Rangel should be fired.)  Whether Foletta or Woolston made the decision to terminate Rangel is an issue of no consequence here.  As the case law makes clear, Foletta's (in)ability to hire and fire other employees is not dispositive in the managing agent inquiry.  *See White, supra,* 21 Cal.4th at 575 n. 4.  Rather, the seemingly unbridled manner in which Foletta was permitted to perform what admittedly was a primary aspect of her job is the critical factor.  The evidence suggests that, under *White,* ensuring its ambulance technicians acted professionally toward other employees and patients was a significant aspect of AMR's

business.  The evidence further suggests Foletta was given complete discretion, unconstrained by

any authority or supervision from above, to determine how and for what reason to investigate and

terminate employees when faced with a situation implicating an employee's professionalism.  Based

on the foregoing evidence, a reasonable trier of fact could conclude, under the clear and convincing

standard, Foletta created and administered a local, ad hoc investigation and termination policy.

Foletta's actions belie her assertions that  she had no authority to establish corporate policy for AMR

and that policy is set at a much higher management level.  From the moment she learned of the

August 10, 2008 incident, she assumed near-sole control of the decision-making process leading to

Rangel's termination.   Without requesting approval or relying on any written policy other than the

vague and uninstructive language of section 23.4, she initiated her own investigation and determined

Rangel needed to be terminated.  The August 28, 2008 letter from AMR to Rangel formally advising

Rangel of her termination shows AMR terminated Rangel precisely because of Foletta's

investigation and findings and suggests AMR allowed Foletta's ad hoc policy to persist. These

circumstances, when considered with the evidence AMR's proffered reason for Rangel's discharge

was pretextual, suggest Foletta may have further instituted an implicit human resources policy to

terminate employees who, like Rangel, have reported sexual harassment.  Under *Egan, Agarwal*,

*Siva* and *White*, this would be sufficient to transform Foletta into AMR's managing agent.

That a triable issue exists whether Foletta was AMR's managing agent for the purpose of

applying section 3294 does not, of course, automatically create a triable issue as to punitive damages;

the Court must further find a triable exists whether Foletta's conduct was malicious, oppressive

and/or fraudulent.  " 'Malice' means conduct which is intended by the defendant to cause injury to

the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious

disregard of the rights or safety of others."  Cal. Civ. Code, § 3294, subd. (c)(1).  " 'Oppression'

means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard

of that person's rights." *Id.*, § 3294, subd. (c)(2).  " 'Fraud' means an intentional misrepresentation,

deceit, or concealment of a material fact known to the defendant with the intention on the part of the

defendant of thereby depriving a person of property or legal rights or otherwise causing injury." *Id*., § 3294, subd. (c)(3).  AMR contends Rangel cannot prove the conduct of an officer, director or managing agent of AMR's rose to the level of malice, oppression or fraud because Rangel's termination "was based on [Rangel's] own violation of [AMR] policy and the collective bargaining agreement, and there was no intent to cause [Rangel] any harm."  The Court rejects this contention.

In *Cloud v. Casey,* 76 Cal.App.4th 895, 90 Cal.Rptr.2d 757 (1999), the Court of Appeal held a jury may reasonably find malice where the evidence shows an employer tried to cover up an improper reason for a firing with a false explanation.  *Id*. at 912.  The plaintiff, Vibeke Cloud, brought a gender discrimination action on a constructive discharge theory against her former employer, Western Atlas, Inc. ("Western"), Western's parent company, Litton Industries, Inc. ("Litton"), and several of Western's supervisors when she resigned from Western after Western denied her a promotion and terminated the consulting services agreement she had had with the company. *Id*. at 899-900.  At the close of trial the jury awarded compensatory and punitive damages in favor of Cloud, finding Western had discriminated against Cloud on the basis of her gender and that Litton had aided and abetted in the discrimination.  The trial court denied the corporations' motion for judgment notwithstanding the verdict on liability but granted their motion as to the punitive damages verdict.  The Court of Appeal reversed as to the second motion.  *Id*. at 901, 912.

On appeal Cloud argued the trial court erred in overturning the jury's finding on punitive damages because the evidence that supported the jury's finding of liability also provided a sufficient basis for the jury to find malice or oppression.  *Cloud, supra,* 76 Cal.App.4th at 911.  The Court of Appeal agreed.  *Id*.  The court first summarized the evidence supporting the finding of liability, noting there was both direct evidence of discriminatory intent and circumstantial evidence of pretext.  Direct evidence included statements by Western's CFO and other officers that Western had never had a woman in the position sought by Cloud, that it was not comfortable to have a woman in that position,  that men did not like smart competent women working for them and that perhaps gender was a factor in failing to promote Cloud.  *Id*.  Circumstantial evidence of pretext included the fact

the operational experience requirement Western relied on in explaining why it decided not to promote Cloud was developed only after another candidate had already been selected for the position. *Id*. at 911-12.  Based on this evidence, the court reasoned: "The jury could properly conclude that the corporations intentionally discriminated by denying Ms. Cloud a promotion based on gender, then attempted to hide the illegal reason for their decision with a false explanation, and that in this, they acted in a manner that was base, contemptible or vile.  The discriminatory employment decision denied Ms. Cloud her protected right under FEHA 'to seek, obtain, and hold employment without discrimination or abridgment on account . . . of . . . sex . . . .' [Citation.] Evidence that the decision-maker attempted to hide the improper basis with a false explanation also supports the jury's determination that the conduct was willful and in conscious disregard of Ms. Cloud's rights. [¶] Viewing the evidence in the light most favor to the jury's verdict, we find it sufficient to support a finding the corporations acted with malice or oppression . . . ." *Id*. at p. 912.

*Stephens v. Coldwell Banker Commercial Group, Inc.,* 199 Cal.3d 1394, 245 Cal.Rptr. 606 (1988) (disapproved of on other ground by *White, supra,* 31 Cal.4th at 575 n. 4), is further instructive as to why a triable issue of malice and/or oppression exists here.  William Stephens, who had worked as a real estate manager for Coldwell Banker, obtained an award of compensatory and punitive damages against his employer on a complaint alleging FEHA age discrimination after his supervisor, John Mack, demoted him in favor of a significantly younger employee and reduced the compensation on one of Stephens's major accounts by nearly half.  *Id*. at 1398-99.  On appeal the court, affirming the punitive damages award, found there was sufficient evidence the "demotion of [Stephens] exhibited a conscious disregard of [Stephens's] right to be considered on his own merits without regard to age and a willingness to injure [Stephens] which was both intentional and malicious."  *Id*. at 1404.  This evidence included the fact Mack had hired the younger employee even though there was no open position or adequate funds to pay him; inquired about Stephens's retirement plans; and engaged in criticism of Stephens's job performance, which Stephens was able to successfully counter by showing he had consistently been recognized for his outstanding job performance.  *Id*. at 1401.

55

In this case, there is no direct evidence of retaliatory animus on the part of the Foletta. Nevertheless, there is sufficient circumstantial evidence, as in *Casey* and *Stephens*, from which a reasonable trier of fact could find AMR, by virtue of Foletta's actions as a managing agent, intentionally terminated Rangel because she had a engaged in a protected activity (i.e., reporting sexual harassment) and then gave a false explanation to cover up the reason for the termination.  As the Court concluded in a previous section of this order, evidence exists for a reasonable trier of fact to conclude AMR's proffered reason for the termination – namely, that Rangel had violated section 23.4 of the CBA – was not legitimate but merely pretext to retaliate against and discharge Rangel for having reported sexual harassment.  This evidence, as discussed above, includes the temporal proximity between Rangel's complaint of the August 10, 2008 exposure incident and her August 28, 2008 termination as well as the fact Martinez's treatment of Rangel was a topic during both the complaint and the discharge.  If a jury were to find pretext, under *Casey* and *Stephens*, a jury could further find AMR and Foletta, in continuing to maintain a violation of section 23.4 was the true basis for the termination, were attempting to hide an unlawful basis for the termination with a false explanation.  The corollary that naturally arises pursuant to such a finding is AMR and Foletta knew they were violating state and federal anti-retaliation laws in "conscious disregard of [Rangel's] right[s]," *Stephens, supra,* 199 Cal.App.3d at 1404, and thereby "acted in a manner that was base, contemptible or vile." *Cloud, supra,* 76 Cal.App.4th at 912; compare *Scott v. Phoenix Schools, Inc.,* 175 Cal.App.4th 702, 716-17, 96 Cal.Rptr.3d 159 (2009) (no malice or oppression where employer did not terminate employee for prohibited reason or attempt to hide the reason for termination).  Accordingly, summary adjudication of the prayer for punitive damages cannot be granted for AMR.

**V. DISPOSITION**

Based on the foregoing, AMR's and Fischer's motion for summary judgment is DENIED.

AMR's and Fischer's motion for partial summary judgment (i.e., summary adjudication) in the alternative is granted in part and denied in part.  Summary adjudication is GRANTED in favor of Fischer (but not AMR) as to the third cause of action for defamation and in favor of AMR as to the fifth cause of action for sexual battery.  Summary adjudication of all other causes of action as well as the prayer for punitive damages is DENIED.

The Court hereby refers the case to the Magistrate Judge for a trial-setting conference.

IT IS SO ORDERED.

Dated:   April 24, 2013                        _____

                                                    SENIOR  DISTRICT  JUDGE